# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Room 1174 at the Westin Beach Resort & Spa, 321 N. Ft<br>Lauderdale Beach Blvd., Fort Lauderdale, Florida 33304<br>fully described in Attachment "A." | )<br>)<br>)<br>)<br>)<br>) | Case No. 21-6283-SNOW |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Room 1174 at the Westin Beach Resort & Spa, 321 N. Ft Lauderdale Beach Blvd., Fort Lauderdale, Florida 33304 fully described in Attachment "A,"

located in the _____ Southern _____ District of _____ Florida _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment "B."

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1343 and 2,15<br>U.S.C. Sections 78j(b) & 78ff,<br>17 C.F. | Wire Fraud, Securities Fraud |

The application is based on these facts:

See attached Affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Ed Gannon*

*Applicant's signature*

Edward F. Gannon, Postal Inspector, USPIS

*Printed name and title*

Sworn to before me telephonically.

Date: April 30, 2021

*Lurana S. Snow*

*Judge's signature*

City and state: Fort Lauderdale, Florida

Lurana S. Snow, United States Magistrate Judge

*Printed name and title*

USAO_SDNY_000000095

**ATTACHMENT A**

**I.  Premises to be Searched—Subject Premises**

The premises to be searched (the "Subject Premises") is described as follows, and includes all locked and closed containers found therein:

A hotel room designated room "1174" located on the eleventh floor of a Westin Beach Resort & Spa, located at 321 N. Ft Lauderdale Beach Blvd., Fort Lauderdale, Florida 33304, as depicted in the following photograph:



USAO_SDNY_000000096

**ATTACHMENT B**

1.      **Items to Be Seized**

A.    **Evidence, Fruits, and Instrumentalities of the Subject Offenses**

The items to be seized from the Subject Premises, as defined in Attachment A, include the following evidence, fruits, and instrumentalities of violations of Title 15, United States Code, Sections 78j(b) & 78ff, 17 C.F.R. Section 240.10b-5 (securities fraud); and Title 18, United States Code, Sections 1343 and 2 (wire fraud) (collectively, the "Subject Offenses") relating to a fraud scheme involving FF Fund I L.P. (the "FF Fund Scheme"):

1.      Evidence concerning occupancy or ownership of the Subject Premises, including utility and telephone bills, mail envelopes, addressed correspondence, diaries, statements, identification documents, address books, telephone directories, and keys.

2.      Evidence concerning the identity or location of, and communications with, potential co-conspirators and/or victims of the FF Fund Scheme.

3.      Evidence, including documents and communications, reflecting the state of mind of participants in the Subject Offenses, including communications among members of the scheme and any communications reflecting false (purportedly exculpatory) explanations of any participant's involvement in the Subject Offenses.

4.      Evidence, including documents and communications, of motive for the Subject Offenses.

5.      Evidence of other individuals who may have assisted the FF Fund Scheme, ledgers, delivery and payment records, accounting records, data that was sent or received, notes as to how the criminal conduct was achieved, records of discussions about the crime, promotional materials, and other records reflecting the planning and execution of the FF Fund Scheme.

6.      Evidence concerning the proceeds of the FF Fund Scheme, including United States and/or foreign currency, coins or bars of precious metals, jewelry, documentation of financial transactions, bank statements, checks, books, records, invoices, payment receipts, money orders, cashier's checks, bank checks, safe deposit box keys, money wrappers, filed and non-filed income tax records, credit card receipts, credit card statements, minute books and other items evidencing the obtaining, secreting, transferring, and/or concealment of assets and the obtaining, secreting, transferring, concealment, and/or expenditure of money as part of the FF Fund Scheme.

7.      Evidence revealing the passwords or other information of co-conspirators of the Subject Offenses needed to access the user's computer, smartphone, or other devices or accounts that may contain evidence of the Subject Offenses.

8.      Documents and other materials identifying the location of other evidence of the Subject Offenses.

USAO_SDNY_000000097

**B. Search and Seizure of Electronically Stored Information**

The items to be seized from the Subject Premises also include any computer devices, cellphones, and storage media that may contain any electronically stored information falling within the categories set forth in Section I.A of this Attachment above, including desktop and laptop computers, disk drives, modems, thumb drives, personal digital assistants, smart phones, digital cameras, and scanners. In lieu of seizing any such computer devices, cellphones, or storage media, this warrant also authorizes the copying of such devices or media for later review.

The items to be seized from the Subject Premises also include:

1.    Any items or records needed to access the data stored on any seized or copied computer devices, cellphones, or storage media, including any physical keys, encryption devices, or records of login credentials, passwords, private encryption keys, or similar information.

2.    Any items or records that may facilitate a forensic examination of the computer devices, cellphones, or storage media, including any hardware or software manuals or other information concerning the configuration of the seized or copied computer devices, cellphones, or storage media.

3.    Any evidence concerning the identities or locations of those persons with access to, control over, or ownership of the seized or copied computer devices, cellphones, or storage media.

**C. Review of ESI**

Following seizure of any computer devices, cellphones, and storage media and/or the creation of forensic image copies, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein for information responsive to the warrant that was created, modified, accessed, sent, received, and/or deleted between on or about January 1, 2014 and the date of the execution of the search warrant.

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

2 of 3

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

- performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the device was used.

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in Sections I.A and I.B of this Attachment.  However, law enforcement personnel are authorized to conduct a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant.

USAO_SDNY_000000099

**AFFIDAVIT**

I, Edward F. Gannon, a Postal Inspector with the United States Postal Inspection Service ("USPIS"), being duly sworn, hereby depose and state as follows:

1.     I have been with USPIS for approximately 14 years.  During my tenure with USPIS, I have participated in the investigations of numerous frauds, and have conducted physical and electronic surveillance, the execution of search warrants, and debriefing of witnesses.  Through my training, education, and experience, I have become familiar with the manner in which securities frauds are perpetrated.  I have participated in the execution of numerous search warrants, including search warrants involving electronic evidence in cases stemming from securities fraud investigations.  In addition, I review financial evidence, conduct surveillance, and obtain pen registers, among other things.

2.     I make this Affidavit in support of an application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises located at Room 1174 at the Westin Beach Resort & Spa, 321 N. Ft Lauderdale Beach Blvd., Fort Lauderdale, Florida 33304 ("Subject Premises"), as more particularly described in Attachment A, for and to seize the items and information that constitute evidence, fruits, and instrumentalities of a crime as described in Attachment B.  This Affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience, and advice received concerning the use of computers and/or smartphones in criminal activity and the forensic analysis of electronically stored information ("ESI").  Because this Affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the

USAO_SDNY_000000100

contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

3.      For the reasons detailed below, there is probable cause to believe that the Subject Premises contain evidence, fruits, and instrumentalities of violations Title 15, United States Code, Sections 78j(b) & 78ff, 17 C.F.R. Section 240.10b-5 (securities fraud); and Title 18, United States Code, Sections 1343 and 2 (wire fraud) (collectively, the "Subject Offenses").

## Probable Cause

### A.   Probable Cause Regarding Subject's Commission of the Subject Offenses

4.      On April 20, 2021, ANDREW FRANZONE was charged in a Complaint captioned *United States v. Andrew Franzone*, with the Subject Offenses.  The aforementioned Complaint (the "Complaint') is attached hereto as Exhibit A and incorporated by reference in this Affidavit.  On April 20, 2021, the Honorable James L. Cott, United States Magistrate Judge, Southern District of New York, signed an arrest warrant for FRANZONE.

5.      As detailed in the Complaint, FRANZONE was formerly the General Partner of FF Fund I L.P. ("FF Fund"), an investment fund in which FRANZONE defrauded investors into providing more than $40 million that FRANZONE diverted to illiquid investments and also misappropriated.  FF Fund is currently in liquidation proceedings in the Southern District of Florida (the "Fund Liquidation").

### B.   Probable Cause Justifying Search of the Subject Premises

6.      During an April 16, 2021 deposition in the course of the Fund Liquidation, FRANZONE stated that he did not have a permanent residence address at that time.  The address FRANZONE provided as the address for FF Fund was the address of a coworking space in the Miami, Florida area.

3

7.      On or about April 20, 2021, the Honorable James L. Cott, United States
Magistrate Judge, Southern District of New York, signed a warrant authorizing USPIS to obtain
prospective geolocation data for a phone used by FRANZONE (the "GPS Warrant").  Based
upon my review of data obtained pursuant to the GPS Warrant, I concluded that FRANZONE
was likely residing in the vicinity of a hotel located at 321 N. Ft Lauderdale Beach Blvd., Fort
Lauderdale, Florida 33304 (the "Hotel").

8.      On or about April 22, 2021, I spoke with a manager of the Hotel, who told me, in
substance and in part, that FRANZONE had been living at the Hotel for approximately the
previous 12 months, but was slated to leave the hotel that day due to nonpayment.   Based upon
my review of records provided by the Hotel, I have learned that FRANZONE was a guest at the
Hotel continuously from in or about April 2020 until on or about April 22, 2021, and that the
Subject Premises was FRANZONE's room from at least in or about December 2020 until on or
about April 22, 2021.

9.      On or about April 22, 2021, FRANZONE was arrested at a restaurant on the Hotel
premises.

10.     On or about April 28, 2021, a representative of the Hotel ("Hotel Employee-1")
told me that Hotel Employee-1 had entered the Subject Premises the previous day at the request
of a member of FRANZONE's family to collect FRANZONE's belongings.  When Hotel
Employee-1 was inside the Subject Premises, Hotel Employee-1 observed a laptop computer and
what appeared to be piles of financial documents.  Based upon my conversations with Hotel
Employee-1 on or about April 30, 2021, I understand that FRANZONE's belongings remain in
the Subject Premises, which has been accessed only by hotel security since on or about April 22,
2021.  I further understand that non-security hotel staff and other hotel guests have not been

4

permitted to enter or use the Subject Premises.  I also understand that hotel security has not removed items from or brought additional items into the Subject Premises since April 22, 2021.

11.    Given FRANZONE's lack of a permanent residence, his use of a coworking space for purposes of operating FF Fund, and his apparent residence at the Subject Premises, there is probable cause to believe that the Subject Premises contains evidence related to FRANZONE's operation of FF Fund and, therefore, the Subject Offenses.

**C.  Probable Cause Justifying Search of ESI**

12.    Based on my training and experience, I know that individuals who engage in conspiracies to commit wire fraud and securities fraud, commonly use computers, cellphones, and other electronic devices to access websites used for illegal activity; communicate with co-conspirators and victims online; keep track of co-conspirators' and victims' contact information; keep a record of illegal transactions or criminal proceeds for future reference; store data regarding victims and potential victims for future exploitation.  As a result, they often store data on their computers, cellphones, and other electronic devices related to their illegal activity, which can include logs of online "chats" with co-conspirators or victims; email correspondence; contact information of co-conspirators and victims, including telephone numbers, email addresses, and identifiers for instant messaging and social medial accounts; financial and personal identification data for victims and potential victims, including bank account numbers, credit card numbers, and names, addresses, and telephone numbers of other individuals; and/or records of illegal transactions or the disposition of criminal proceeds.

13.    Based upon my participation in this investigation and my review of email communications involving FRANZONE, and as set forth in Exhibit A, paragraphs 6 through 7, I know that FRANZONE used email to communicate with investors in FF Fund to perpetrate the Subject Offenses.

USAO_SDNY_000000103

14.    Based on my training and experience, I also know that, where computers, cellphones, and other electronic devices are used in furtherance of criminal activity, evidence of the criminal activity can often be found months or even years after it occurred.  This is typically true because:

- Electronic files can be stored on a hard drive for years at little or no cost and users thus have little incentive to delete data that may be useful to consult in the future.

- Even when a user does choose to delete data, the data can often be recovered months or years later with the appropriate forensic tools.  When a file is "deleted" on a computer, cellphones, or other electronic devices, the data contained in the file does not actually disappear, but instead remains on the hard drive, in "slack space," until it is overwritten by new data that cannot be stored elsewhere on the device.  Similarly, files that have been viewed on the Internet are generally downloaded into a temporary Internet directory or "cache," which is only overwritten as the "cache" fills up and is replaced with more recently viewed Internet pages.  Thus, the ability to retrieve from a hard drive or other electronic storage media depends less on when the file was created or viewed than on a particular user's operating system, storage capacity, and user habits.

- In the event that a user changes devices, the user will typically transfer files from the old device to the new device, so as not to lose data.  In addition, users often keep backups of their data on electronic storage media such as thumb drives, flash memory cards, CD-ROMs, or portable hard drives.

15.    In addition to there being probable cause to believe that computers, cellphones, and/or other electronic devices will be found at the Subject Premises that contain evidence of the Subject Offenses, there is also probable cause to believe that these devices constitute instrumentalities of the Subject Offenses because they were used to communicate with victims.

16.    Based on the foregoing, I respectfully submit there is probable cause to believe that FRANZONE was engaged in the Subject Offenses and that evidence of this criminal activity is likely to be found in the Subject Premises and on computers, cellphones, and other electronic media found in the Subject Premises.

USAO_SDNY_000000104

## II.  Procedures for Searching ESI

### A.  Execution of Warrant for ESI

17.     Federal Rule of Criminal Procedure 41(e)(2)(B) provides that a warrant to search for and seize property "may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information . . . for later review."  Consistent with Rule 41, this application requests authorization to seize any computer devices, cellphones, and storage media and transport them to an appropriate law enforcement facility for review.  This is typically necessary for a number of reasons:

- First, the volume of data on computer devices, cellphones, and storage media is often impractical for law enforcement personnel to review in its entirety at the search location.

- Second, because ESI is particularly vulnerable to inadvertent or intentional modification or destruction, computer devices, cellphones, and other storage media ideally are examined in a controlled environment, such as a law enforcement laboratory, where trained personnel, using specialized software, can make a forensic copy of the storage media that can be subsequently reviewed in a manner that does not change the underlying data.

- Third, there are so many types of computers, cellphones, and storage media hardware and software in use today that it can be impossible to bring to the search site all of the necessary technical manuals and specialized personnel and equipment potentially required to safely access the underlying data.

- Fourth, many factors can complicate and prolong recovery of data from a computer device, cellphone, or other electronic storage device, including the increasingly common use of passwords, encryption, or other features or configurations designed to protect or conceal data on the device, which often take considerable time and resources for forensic personnel to detect and resolve.

### B.  Review of ESI

18.     Following seizure of any computer devices, cellphones, and storage media and/or the creation of forensic image copies, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts

7

under government control) will review the ESI contained therein for information responsive to the warrant that was created, modified, accessed, sent, received, and/or deleted between on or about January 1, 2014 and the date of the execution of the search warrant.

19.    In conducting this review, law enforcement personnel may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses.  Such techniques may include, for example:

- surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

- "scanning" storage areas to discover and possibly recover recently deleted data or deliberately hidden files; and

- performing electronic keyword searches through all electronic storage areas to determine the existence and location of data potentially related to the subject matter of the investigation[1]; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the device was used.

20.    Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant.  Depending on the circumstances, however, law enforcement personnel may need to conduct a complete review of all the ESI from seized devices or storage media to evaluate its contents and to locate all data responsive to the warrant.

---

[1] Keyword searches alone are typically inadequate to detect all relevant data. For one thing, keyword searches work only for text data, yet many types of files, such as images and videos, do not store data as searchable text. Moreover, even as to text data, there may be information properly subject to seizure but that is not captured by a keyword search because the information does not contain the keywords being searched.

USAO_SDNY_000000106

### C.  Return of ESI

21.     If the Government determines that the electronic devices are no longer necessary to retrieve and preserve the data, and the devices themselves are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return these items, upon request. Electronic data that is encrypted or unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the Subject Offenses.

## III.  Conclusion and Ancillary Provisions

22.     Based on the foregoing, I respectfully request the court to issue a warrant to seize the items and information specified in Attachment B to this Affidavit and to the Search and Seizure Warrant.

Edward F. Gannon
Postal Inspector
United States Postal Inspection Service

Sworn to and subscribed before me telephonically this   30th   day of April, 2021.

LORANA S. SNOW
UNITED STATES MAGISTRATE JUDGE



Certified to be a true and
correct copy of the document on file
Angela E. Noble, Clerk,
U.S. District Court
Southern District of Florida
By_____ J. Zanotti_____
                                   Deputy Clerk
Date  Apr 30, 2021

9

# EXHIBIT A

USAO_SDNY_000000108

Approved: _____
         KIERSTEN A. FLETCHER
         Assistant United States Attorney

Before:   THE HONORABLE JAMES L. COTT          **21 MAG 4261**
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - x    **SEALED COMPLAINT**
                              :
UNITED STATES OF AMERICA      :    Violations of
                              :    15 U.S.C. §§ 78j(b) and
        - v. -                :    78ff; 17 C.F.R. § 240.10b-
                              :    5; 18 U.S.C. §§ 1343 and 2.
ANDREW FRANZONE,              :
                              :    COUNTY OF OFFENSES:
            Defendant.        :    New York
                              :
- - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

    EDWARD F. GANNON, being duly sworn, deposes and says that
he is a Postal Inspector with the United States Postal
Inspection Service and charges as follows:

### COUNT ONE
### (Securities Fraud)

    1.    From at least in or about 2014, up to and including in
or about September 2019, in the Southern District of New York
and elsewhere, ANDREW FRANZONE, the defendant, willfully and
knowingly, directly and indirectly, by use of the means and
instrumentalities of interstate commerce and of the mails, and
of the facilities of national securities exchanges, used and
employed manipulative and deceptive devices and contrivances in
connection with the purchase and sale of securities in violation
of Title 17, Code of Federal Regulations, Section 240.10b-5, by
(a) employing devices, schemes, and artifices to defraud;
(b) making untrue statements of material fact and omitting to
state material facts necessary in order to make the statements
made, in the light of the circumstances under which they were
made, not misleading; and (c) engaging in acts, practices, and
courses of business which operated and would operate as a fraud
and deceit upon persons, to wit, FRANZONE fraudulently induced
victims to purchase limited partnership interests in an
investment fund by means of misrepresentations and omissions,

1

and continued that pattern of fraudulent misrepresentations and
omissions throughout the life of the fund.

(Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5; and
Title 18, United States Code, Section 2.)

### COUNT TWO
### (Wire Fraud)

2.    From at least in or about 2014, up to and including in
or about September 2019, in the Southern District of New York
and elsewhere, ANDREW FRANZONE, the defendant, willfully and
knowingly, having devised and intending to devise a scheme and
artifice to defraud and for obtaining money and property by
means of false and fraudulent pretenses, representations, and
promises, and attempting to do so, did transmit and cause to be
transmitted by means of wire, radio, and television
communication in interstate and foreign commerce, writings,
signs, signals, pictures, and sounds for the purpose of
executing such scheme and artifice, to wit, FRANZONE, using
electronic transfers of funds, email communications, interstate
telephone calls, and other wire communications, fraudulently
induced his victims to purchase limited partnership interests in
an investment fund by means of misrepresentations and omissions,
and continued that pattern of fraudulent misrepresentations and
omissions throughout the life of the fund.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and for the foregoing charges are,
in part, as follows:

3.    I have been a Postal Inspector with United States
Postal Inspection Service ("USPIS") for approximately 14 years.
I am currently assigned to an USPIS group focused on
investigating complex white-collar crimes, including securities
fraud, commodities fraud, wire fraud, and other financial
crimes.  As part of my work with USPIS, I have received training
regarding ways in which these crimes are perpetrated, have
participated in numerous investigations of such offenses, and
have made and participated in arrests of individuals who have
committed such offenses.

4.    Since in or about December 2020, I have been
investigating ANDREW FRANZONE, the defendant, and his fraudulent
activities in connection with his role as founder and General

2

Partner of FF Fund I L.P.  The information contained in this
Complaint is based upon my personal knowledge, as well as
information obtained during the course of this investigation,
directly or indirectly, from other sources, including:
(a) conversations with, and reports prepared by, other law
enforcement agents; (b) information and documents obtained from
non-law enforcement witnesses, including FF Fund investors and
individuals currently involved in the liquidation of FF Fund;
(c) documents and information obtained from banks and other
financial institutions; (d) publicly available information;
including public filings in FF Fund's bankruptcy proceedings and
other litigation; and (e) documents and information collected by
the United States Securities and Exchange Commission (the "SEC")
in connection with a parallel SEC investigation of FRANZONE.
Because this Complaint is being submitted for the limited
purpose of demonstrating probable cause, it does not include all
the facts that I have learned during the course of my
investigation.  Where the contents of documents and the actions,
statements, and conversations of others are reported herein,
they are reported in substance and in part, except where
otherwise indicated.

<u>Overview</u>

5.    Based on my participation in this investigation, as
well as the sources listed in paragraph 4 *supra*, I have learned
the following, in substance and in part:

    a.    ANDREW FRANZONE, the defendant, is a 44-year old
citizen of the United States.

    b.    In or about 2010, FRANZONE and another individual
("Individual-1") began soliciting investments in a newly formed
hedge fund, Farrell Franzone Investments LLC ("Farrell
Franzone").  FRANZONE described Farrell Franzone as an
opportunity for investors to invest, through the purchase of
limited partnership ("LP") interests, in a hedge fund purporting
to trade preferred securities and options and to maintain a
highly liquid portfolio for its investors.  From 2010 until late
2014, Farrell Franzone maintained an office in Manhattan, New
York.

    c.    In or about late 2014, Individual-1 left Farrell
Franzone and FRANZONE renamed the fund FF Fund I ("FF Fund").
FRANZONE also moved to Florida and began operating FF Fund out
of the Miami, Florida area. FRANZONE assured existing and
prospective investors that FF Fund would continue to employ the

3

same investment strategy employed at Farrell Franzone, including
that FF Fund would maintain a highly liquid portfolio and that
this liquidity would ensure that investors could redeem their LP
interests on a quarterly basis.

     d.   Between in or about late 2014 and FF Fund's
bankruptcy in or about September 2019, FRANZONE served as FF
Fund's General Partner responsible for managing FF Fund's
investments, which he touted to prospective investors as a
"multi-strategy investment program … focus[ed] on three unique
asset classes: the preferred stock market, the option market,
and the private investment portfolio."  When discussing FF Fund,
FRANZONE represented that FF Fund was focused on trading in the
preferred securities and options markets, and that FF Fund had a
track record of consistent positive trading returns since its
inception in August 2010.

     e.   Throughout the life of FF Fund, FRANZONE also
continued to maintain, among other things, that FF Fund was
highly liquid, that the trading strategy continued to focus on
preferred securities and options, and that private investments
accounted for no more than 20% of FF Fund's investments.
FRANZONE further maintained that FF Fund's proprietary trading
strategy was achieving consistent, positive returns, as
reflected in monthly performance reports FRANZONE sent to
investors.

     f.   By in or about late 2018, FRANZONE represented to
investors and prospective investors in FF Fund that FF Fund had
reached $70 million in assets under management.

     g.   In fact, and as further set forth below, these
representations by FRANZONE, were largely false.  Contrary to
his claims that FF Fund was engaged primarily in preferred
securities and options trading that ensured the FF Fund's
liquidity, and that investors could redeem their LP interests on
a quarterly basis, by in or about 2018 FRANZONE had in fact
diverted more than 80% of FF Fund's assets to high-risk,
illiquid private investments, many of which were either
worthless or significantly impaired, and had misappropriated
fund assets to fund his own personal business interests.
Furthermore, FRANZONE's representation that FF Fund had $70
million in assets under management by in or about late 2018 was
false, as FF Fund in fact never had more than $40 million in
assets under management.  Finally, FRANZONE's representations to
investors about the positive performance of FF Fund, including

4

the monthly performance reports provided to investors, were
largely fabricated.

      h.   Through these and other fraudulent
misrepresentations and omissions, described further below,
FRANZONE induced over 100 investors to invest more than $40
million in FF Fund.  Despite showing investors positive trading
returns as late as in or about early 2019, FF Fund could not
satisfy redemption requests and is currently in the process of
being liquidated.

<u>FF Fund's Purported Trading Strategy</u>

    6.   Based on my participation in this investigation, and
my review of marketing materials and email communications
provided or caused to be provided by ANDREW FRANZONE, the
defendant, to investors and prospective investors in FF Fund, as
well as the sources listed in paragraph 4 *supra*, I have
learned that FRANZONE touted FF Fund's trading strategy and its focus on
preferred securities and options, including by describing that
strategy in detail and providing investors and prospective
investors with detailed information on the returns generated
through the trading strategy, including, in substance and in
part, the following:

      a.   The Private Placement Memorandum ("PPM")
governing FF Fund described the "core of the Partnership's
multi-strategy investment program" to be a "focus on three
unique asset classes: the preferred stock market, the option
market, and the private portfolio."  The PPM further explained
that through FF Fund's  "proprietary pricing models and the
Principal's 14 years of trading and investing experience," FF
Fund would "seek to exploit short, medium, and long-term
valuation and volatility inefficiencies across the universe of
exchange-traded preferred stock and option securities, and seek
capital appreciation and income in the private portfolio."

      b.   FF Fund's website further touted its "Trading
Philosophy," which included, among other things:

        i.   A multi-paragraph discussion describing FF
Fund's "focus on the option and preferred markets" and the
ability of trading in those markets to achieve a "balanced and
predictable quarterly income stream";

        ii.   A detailed summary of the "fundamentals and
trading characteristics" to be considered by FF Fund in trading

5

preferred securities and options, including "capital structure," "coupon size," "liquidity and trade execution," "directional short positions," and "current income trading strategies"; and

       iii.    A single paragraph on FF Fund's use of "Private/Non-Exchange Traded Investments," representing that FF Fund would devote "a portion of its capital … to attempt to minimize the portfolio's overall volatility and exposure to exchange traded market risk."

       c.    In conversations with investors and prospective investors, FRANZONE repeatedly represented that FF Fund was engaged in securities trading and that FF Fund's returns represented trading returns.  For example, in a February 25, 2016 email to a Manhattan-based FF Fund investor ("Investor-1"), FRANZONE told Investor-1 that "February 2015 has also been tracking nicely as well on the trading front and the monthly return in February 2016 is currently still posting a gain with just 3 trading days to go in the month."

       d.    On or about July 25, 2016, FRANZONE emailed a prospective investor and told the investor, in substance and in part, that:

       i.    FF Fund was a "multi-strategy fixed income hedge fund, and it typically appeals to people who are looking for an annual income stream from preferred stocks, bonds, or other high-yielding, asset-backed public or private investments."

       ii.    FF Fund was "continuing to track along nicely here on the trading front to start out 2016 with a year-to-date 2016 gain of about 3.5% net of all fees and expenses through the end of June 2016."

       iii.    FRANZONE "update[d] the fund's track record once every week throughout the middle of each month so that all of the fund's investors can follow along with the trading returns in real-time in between the official monthly investor statements"; and

       iv.    FF Fund's "lowest return over any rolling 12-month consecutive period has been a gain of 5.21% net of all fees and expenses, and the highest return over any rolling 12-month consecutive period has been a gain of 24.03% net of all fees and expenses."

6

e.   On or about August 21, 2018, FRANZONE emailed another prospective investor, copying a Manhattan-based wealth manager ("Wealth Manager-1"), and repeated the same claims about FF Fund's trading strategy and returns, including by, among other things:

i.    Providing a document purporting to reflect FF Fund's rolling 12-month returns, which showed FF Fund had positive trading returns ranging from 5% to more than 18% every month from August 2010 through August 2018.

ii.    Representing that FF Fund had approximately $70 million in assets under management, and that "the strategy is … roughly 60% income securities, mostly with strategies to add income and kickers over dividends; 10% equity, mostly income producing with dividends and options; 10% alternatives; 10% real estate; and 10% private investments."

f.   On or about May 30, 2017, FRANZONE emailed another prospective investor, and represented that he was "just trading on the screens throughout all of the days" and could therefore speak to the prospective investor any time that week or the following week.

<u>FRANZONE Defrauds Investors in FF Fund</u>

7.   Based on my participation in this investigation, including my interviews of investors in FF Fund, my review of materials provided by investors in FF Fund, as well as the sources listed in paragraph 4 *supra*, I have learned the following, in substance and in part:

a.   In or about 2012, ANDREW FRANZONE, the defendant was introduced to Investor-1 by Wealth Manager-1, Investor-1's family member who then worked in wealth management at a large investment firm.

b.   In addition to Investor-1's management of Investor-1's personal investments, Investor-1 also acted as Trustee of a family trust unrelated to Investor-1's family (the "Trust"), and made investment decisions on behalf of the Trust. During the relevant time period, certain of the Trust's investments were managed by Wealth Manager-1.  In or about 2012, Investor-1 invested approximately $1.1 million of Investor-1's personal retirement funds in FF Fund.

USAO_SDNY_000000115

     c.   Investor-1 invested in FF Fund based on FRANZONE's representation that FF Fund traded in preferred securities and options and was highly liquid.  Investor-1 was aware that FF Fund might devote a small portion of FF Fund assets to private investments, but Investor-1 would not have invested in FF Fund if Investor-1 understood that FF Fund intended to pursue an illiquid private investment strategy.

     d.   In the months that followed Investor-1's personal investment in FF Fund, Investor-1 received monthly performance reports by email, which showed Investor-1 that FF Fund was earning positive trading returns every month.

     e.   On several occasions between in or about 2012 and 2014, FRANZONE solicited Wealth Manager-1 and Investor-1 to recruit additional investors to FF Fund, including the Trust, during meetings that took place at FRANZONE's office, as well as Wealth Manager-1's office, both of which were located in Manhattan, New York.  During these and subsequent conversations, FRANZONE claimed that FF Fund's strategy primarily focused on trading in preferred securities and options, and that FF Fund would invest no more than 20% of FF Fund's portfolio in illiquid private investments through F5, which Wealth Manager-1 understood to be a wholly owned-subsidiary of FF Fund.

     f.   In or about July 2014, the Trust invested approximately $4 million in FF Fund.

     g.   In or about late 2014, Wealth Manager-1 learned that Individual-1 was no longer partnered with FRANZONE and that FRANZONE had moved from New York to Florida.  In response to Wealth Manager-1's questions about whether FF Fund's trading strategy would change as a result of Indvidiual-1's departure or FRANZONE's move to Florida, FRANZONE assured Wealth Manager-1 that FRANZONE would continue to execute the same liquid trading strategy going forward.

     h.   Based upon FRANZONE's representations to Investor-1 and Wealth Manager-1 that FF Fund was actively trading in preferred securities and options, and that FF Fund had achieved consistent, positive returns on that trading since August 2010, Investor-1, on behalf of the Trust, invested an additional $23.5 million with FF Fund between in or about December 2014 and 2017.

     i.   In addition, based on the above representations, as well as FRANZONE's representation that Wealth Manager-1's

USAO_SDNY_000000116

clients could obtain quarterly liquidity, that is, redeem their investments on three months' notice, Wealth Manager-1 recommended that several of his other clients invest with FF Fund.

   j.   In making investment recommendations, it was critical to Wealth Manager-1 that Wealth Manager-1's clients did not represent a majority of FF Fund's invested capital.  In or about August 2018, FRANZONE represented to Wealth Manager-1 that FF Fund had approximately $70 million in assets under management, which Wealth Manager-1 understood to be approximately double the combined capital invested by Wealth Manager-1's clients.

   k.   In truth and in fact, as set forth below, beginning in or about 2015, FF Fund no longer engaged in any meaningful securities or options trading, was illiquid, never had more than $40 million in assets under management, and the purported rolling 12-month trading returns were largely fabricated by FRANZONE.

   8.   Based on my participation in this investigation, my review of deposition testimony from a second FF Fund investor ("Investor-2"), as well as the sources listed in paragraph 4 *supra*, I have learned the following, in substance and in part:

   a.   Investor-2 first met ANDREW FRANZONE, the defendant, in or about 2012.  Beginning in or about 2014, Investor-2 and her husband ("Investor-3") developed a close personal friendship with FRANZONE arising from, among other things, their shared interest in race car driving.

   b.   In or about 2015, FRANZONE and Investor-3 (who is a former professional race car driver), agreed to start a racing team (the "Racing Team").  FRANZONE represented to Investor-2 and Investor-3 that he earned approximately $1.2 million per year in management fees from FF Fund, in addition to performance fees, and FRANZONE could afford to fund the Racing Team's operations if Investor-3 agreed to act as the Racing Team's manager.

   c.   FRANZONE represented to Investor-2 and Investor-3 that he was skilled in trading securities and that FF Fund was earning steady returns.  Based upon these representations, in or about January 2016, Investor-2 and Investor-3 invested approximately $150,000 in FF Fund.  As noted above, by this date, FF Fund no longer engaged in any meaningful securities or

USAO_SDNY_000000117

options trading, was illiquid, and FRANZONE was fabricating the returns he was providing to investors.

      d.   Investor-2 understood from conversations with FRANZONE that FF Fund was liquid, and that Investor-2 could withdraw the funds Investor-2 had with FF Fund upon demand.

      e.   On one occasion in or about 2016, Investor-2 requested $75,000 from Investor-2's account at FF Fund, and FRANZONE promptly sent Investor-2 the funds.

      f.   Based upon FRANZONE's representations related to FF Fund's returns and liquidity, Investor-2 and Investor-3 made multiple additional investments in FF Fund between in or about 2017 and 2019 totaling approximately $350,000.

### FRANZONE Diverts FF Fund Assets to His Personal Business Interests

   9.   Based on my participation in this investigation, my review of Investor-2's deposition testimony, as well as the sources listed in paragraph 4 *supra*, I have learned the following, in substance and in part:

      a.   In or about 2014, Investor-2 and Investor-3 discussed with FRANZONE the possibility of purchasing an airplane hangar in Florida to store the Racing Team's cars (the "Airplane Hangar"). In or about 2014, Investor-2 and Investor-3 paid the owner of the Airplane Hangar a $50,000 deposit and promised to complete the purchase of the Airplane Hangar the following year.

      b.   In or about October 2015, FRANZONE told Investor-2 and Investor-3 that he wanted to own the Airplane Hangar personally. FRANZONE subsequently provided Investor-2 and Investor-3 approximately $565,000 in funds FRANZONE represented to be his personal funds to purchase the Airplane Hangar and reimburse Investor-2 and Investor-3 for the deposit on the Airplane Hangar.

      c.   From in or about 2015 through 2019, the title for the Airplane Hanger was in the name of an entity owned by Investor-3, notwithstanding that FRANZONE had purchased it. Investor-2 and Investor-3 told FRANZONE that the Airplane Hangar should be in FRANZONE's name, since it belonged to FRANZONE. FRANZONE refused to change the title for the Airplane Hangar, and told Investor-2 that the Airplane Hangar would be

USAO_SDNY_000000118

Investor-2's "insurance plan" should anything happen to
FRANZONE.

   d. FRANZONE paid the taxes and expenses on the
Airplane Hangar until in or about 2019.

 10. Based on my participation in this investigation, my
review of materials provided by FF Fund's fund administrator
(the "Fund Administrator"), my review of materials provided by
Investor-2 and Investor-3, as well as the sources listed in
paragraph 4 *supra*, I have learned the following, in substance
and in part:

   a. In or about early October 2015, a bank account
held in the name of Farrell Franzone LP (the "8543 Account")
received wire transfers from an FF Fund investor as well as from
another bank account in the name of Farrell Franzone LP.

   b. On or about October 2, 2015, the 8543 Account
transferred $100,000 to a second account in the name of Farrell
Franzone Investments LLC (the "1941 Account").

   c. On or about October 2, 2015, the 1941 Account
transferred $100,000 to an account controlled by Investor-3 (the
"Investor-3 Account").

   d. On or about October 6, 2015, the 8543 Account
transferred $465,000 to the 1941 Account.

   e. On or about October 6, 2015, the 1941 Account
transferred $465,000 to the Investor-3 Account.

   f. The Investor-3 Account funded the purchase of the
Airplane Hangar shortly thereafter.

   g. Based on these bank records, I have learned that
contrary to FRANZONE's claim that he was purchasing the Airplane
Hangar with his personal funds, FRANZONE in fact used FF Fund
assets to purchase the Airplane Hangar for his personal
business.

<u>FRANZONE's Fraud is Uncovered</u>

 11. Based on my participation in this investigation, my
review of materials provided by the Fund Administrator, as well
as the sources listed in paragraph 4 *supra*, I have learned the
following, in substance and in part:

11

a.   In or about April 2019, Wealth Manager-1 became suspicious of ANDREW FRANZONE, the defendant, and demanded that FRANZONE meet with Wealth Manager-1 to discuss FF Fund.  Wealth Manager-1 told FRANZONE to bring his laptop to the meeting and to be prepared to discuss FF Fund's investments.

b.   On or about April 30, 2019, FRANZONE and Wealth Manager-1 met in person in Wealth Manager-1's office in Manhattan (the "April 30, 2019 Meeting").  During the April 30, 2019 Meeting, among other things:

i.   FRANZONE admitted that FF Fund had not engaged in public securities trading since January 2018.

ii.   FRANZONE admitted that FF Fund's portfolio was comprised entirely of illiquid investments in private companies held by F5.

iii.   FRANZONE admitted that FF Fund had little to no cash, and that FRANZONE had recently had to borrow $200,000 to fund FF Fund's redemption requests.

iv.   FRANZONE provided Wealth Manager-1 a list of FF Fund's assets (the "April 2019 Asset List"), which included many private, illiquid investments, as well as their purported valuations.

v.   Wealth Manager-1 told FRANZONE that several of the assets on the April 2019 Asset List were inflated in value, including an investment marked by FRANZONE at $500,000 and which was in fact worthless, because the company had filed for bankruptcy.  FRANZONE did not dispute that the April 2019 Asset List contained inflated valuations of FF Fund's assets.

vi.   Wealth Manager-1 demanded that FRANZONE provide Wealth Manager-1 with access to FF Fund's books and records.  FRANZONE initially agreed, but ultimately refused to do so.

c.   Following the April 30, 2019 Meeting, Wealth Manager-1 and Investor-1 sought audited financial statements from FRANZONE, to which FRANZONE responded that he did not have audited financial statements for FF Fund for the years 2015 through 2018, and audited financials would not be available until June 30, 2019.

12

USAO_SDNY_000000120

d.    Beginning in or about June 2019, several of Wealth Manager-1's clients, including the Trust, sent FF Fund redemption requests.  FF Fund did not fulfill the redemption requests and instead filed for bankruptcy protection.

e.    Based upon my conversations with Wealth Manager-1, I have learned that Wealth Manager-1 would not have recommended his clients invest in FF Fund had he known that his clients' investments constituted the vast majority of the invested capital in FF Fund.

12.    Based on my participation in this investigation, my review of Investor-2's deposition testimony and a sworn affidavit submitted by Investor-2 in a related litigation, as well as the sources listed in paragraph 4 *supra*, I have learned the following, in substance and in part:

a.    Investor-2 and Investor-3 had several conversations with ANDREW FRANZONE, the defendant, in the weeks that followed the April 30, 2019 Meeting.

b.    During one such conversation, FRANZONE admitted to Investor-2 and Investor-3 that FF Fund had not engaged in securities trading for the prior two years.

c.    During another conversation, FRANZONE admitted that he had used FF Fund's assets to purchase the Airplane Hangar, contrary to his prior statements that the Airplane Hangar was purchased with FRANZONE's personal funds.

d.    In or about May 2019, FRANZONE asked Investor-2 and Investor-3 to sign backdated documents confirming their awareness in 2015 that FF Fund had purchased the Airplane Hangar and the Airplane Hangar was an FF Fund asset.  Investor-2 and Investor-3 refused to do so.

<u>The Lack of Trading in FF Fund Since January 2015</u>

13.    Based on my participation in this investigation, my review of materials provided by the Fund Administrator, as well as the sources listed in paragraph 4 *supra*, I have learned the following, in substance and in part:

a.    In or about January 2014, FF Fund assets maintained at securities brokerage firms accounted for at least approximately 74% of FF Fund's portfolio.  Less than 1% of FF Fund's portfolio was allocated to private investments.

13

b.    In or about 2014, securities trading on behalf of FF Fund was primarily booked in one of FF Fund's wholly-owned subsidiaries, F1 General Trading Partners ("F1").  After January 1, 2015, no securities trades were executed on behalf of F1.

c.    By the end of in or about 2017, FF Fund assets maintained at securities brokerage firms accounted for only approximately 5% of FF Fund's portfolio, and approximately 80% of FF Fund's portfolio was diverted to private, illiquid investments.

d.    FF Fund engaged in minimal, sporadic securities trading in other FF Fund subsidiaries after in or about 2015. Records from the Fund Administrator show that FF Fund's post-2015 trading returns were either negative or flat.

e.    In or about August 2018, FF Fund had approximately $36 million in invested capital.

f.    Contrary to FRANZONE's representations to investors and prospective investors, *see* paragraphs 6 through 8 *supra*, FF Fund's securities trading after 2015 was small in volume and did not generate anywhere close to the returns FRANZONE represented.

g.    Contrary to FRANZONE's representations to investors and prospective investors, *see* paragraphs 6 through 8 *supra*, FF Fund's portfolio was completely illiquid at least as of 2018, and investors could not achieve the promised quarterly liquidity on their FF Fund investments, nor could they redeem their investments.

h.    Contrary to FRANZONE's representations to investors and prospective investors, *see* paragraphs 6 through 8 *supra*, FF Fund did not have $70 million in assets under management as of in or about August 2018 and instead had only approximately half that, the vast majority of which came from Wealth Manager-1's clients.

<u>FRANZONE Misappropriated FF Fund Assets</u>

14.  Based on my participation in this investigation, including my review of filings in the bankruptcy proceeding involving FF Fund, I have learned, among other things, the following:

14

     a.   In or about September 2019, FF Fund filed for bankruptcy and is currently in the process of being liquidated.

     b.   In the course of FF Fund's liquidation, the court-appointed chief restructuring officer ("CRO") has endeavored to locate and value FF Fund's assets.

     c.   During the CRO's investigation, the CRO determined that F5, that is, the entity that held more than 80% of FF Fund's assets as of 2018, was not in fact a wholly-owned subsidiary of FF Fund.  Instead, based on the CRO's investigation, I have learned that F5 was, at all relevant times, owned and controlled by ANDREW FRANZONE, the defendant, individually.

WHEREFORE, I respectfully request that an arrest warrant be issued for ANDREW FRANZONE, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.


          /s/ Edward F. Gannon with permission JLC

          EDWARD F. GANNON
          Postal Inspector
          United   States   Postal   Inspection
          Service

Sworn to before me this
20th day of April 2021


JAMES L. COTT
United States Magistrate Judge

15