MOSKOWITZ COLSON
GINSBERG SCHULMAN

Moskowitz Colson
Ginsberg & Schulman LLP
80 Broad Street, Suite 1900
New York, NY 10004
(212) 257-6455
www.mcgsllp.com

September 25, 2023

Honorable Vernon S. Broderick
United States District Judge
Southern District of New York
40 Foley Square
New York, N.Y. 10007

Re: *United States v. Andrew Franzone,* 21 Cr. 446 (VSB)

Dear Judge Broderick:

We write to address the questions posed in the Court's order of September 12, 2023. *See* Dkt No. 93. Our responses are below.

1. What were the underlying allegations in the complaint filed in *Hersch v. FF Fund Management, LLC,* C.A. No. 2019-0613-SG?

   Dennis Hersch filed the suit, as trustee for the Linden West Trust, on August 6, 2019, two weeks after the Fund announced a wind down. Among other things, the suit sought (i) dissolution of FF Fund, (ii) appointment of a liquidating trustee, and (iii) damages for alleged fraud, breach of fiduciary duty, and breach of contract against FF Management and Mr. Franzone. Hersch's apparent goal was to force the removal or usurpation of Mr. Franzone as the Fund's GP. The complaint alleged that Defendant:

   A. Abandoned the Fund's alleged investment strategy of trading in liquid securities,
   B. Reported fictitious trading profits to the Limited Partners, while conducting no material amount of trading on the Fund's behalf,
   C. Invested Fund assets in undocumented or poorly documented positions in illiquid companies,
   D. Fraudulently collected or accrued management and incentive compensation based on inflated, unrealized investment valuations and fictitious Fund performance figures,
   E. Misappropriated or encumbered Fund assets,
   F. Paid unnecessary fees to administrators, auditors, and accountants,
   G. Breached its duty to provide the Limited Partners with timely audits of the Fund's financial statements, and
   H. Otherwise grossly mismanaged the Fund and eschewed appropriate internal controls.

2. Why was the Status Quo Order sought in *Hersch v. FF Fund Management, LLC,* C.A. No. 2019-0613-SG?

   The Status Quo Order was sought in the alternative after the Delaware Court denied Plaintiff's request to appoint a liquidating trustee or receiver pendente lite.

3. Were there any requests made for the fund to engage in transactions in excess of $50,000 between the filing of the Status Quo Order and the fund's bankruptcy filing on September 24, 2019?

   No, the Fund did not seek to engage in transactions over $50,000 between the filing of the Status Quo Order on September 6, 2019, and the bankruptcy filing on September 24, 2019. Notably, however, the Status Quo Order included a carve out for the advancement of legal fees greater than $50,000 and did not require the GP to post a bond.

4. Were redemption requests made in or about June 2019?

   Wealth Manager-1 submitted three redemption requests before the June 30 quarterly cutoff, each for related party clients: (1) a $33.7 million request was submitted on June 21 on behalf of Investor-1 in his capacity as trustee of the Linden West Trust, (2) a $1.7 million request was submitted on June 21 on behalf of Investor-1 in his individual capacity, and (3) a $1 million request was submitted on June 24 on behalf of the HKW 2018 Trust.

   In July and August 2019, *after* the June 30 cutoff, Wealth Manager-1 submitted six additional redemption requests for non-related party clients, for a combined total of $2 million.

5. What is the basis for the statement that the "triggering event for the bankruptcy was the status quo order"? (Doc. 84 at 11.)

   Once the Status Quo Order took effect, the Fund could not sell assets greater than $50,000 without petitioning the Court, which impeded its ability to satisfy its debts and manage its day-to-day operations. The highly restrictive nature of the order triggered the Fund's bankruptcy decision.

6. If the fund had the money to fulfill the redemption requests, could it have followed the process outlined in the Status Quo Order related to transactions in excess of $50,000 to fulfill those redemption requests rather than filing for bankruptcy?

While legally permissible, it would have been logistically impossible. Once the Fund announced the wind down on July 25, 2019, it was required to pay external facing liabilities (including capital calls and expenses) before internal facing liabilities (redemptions of approximately $1.2 million). The external facing liabilities totaled millions of dollars and exceeded the amount of liquidity on hand.

7. Is it an accurate statement that the Chief Restructuring Officer ("CRO") "endeavored to locate and value FF Fund's assets."? (Doc. 1 ¶14(c).)

    The CRO endeavored to locate and verify the existence of the assets. Due to the unique nature of the investments, however, he did not attempt to value them.

8. Is it an accurate statement that the CRO discovered that "the entity that held more than 80% of [the fund's] assets as of 2018, was not in fact a wholly-owned subsidiary of [the fund but was] ... owned and controlled by [Franzone]"? (Doc. 1 ¶ 14 (c).)

    In November 2019, two months into the Chapter 11 process, the CRO stated that the Fund "was the owner of F5 Business and the indirect owner of the assets of F5 Business." The CRO addressed this same topic in the disclosure document approved by the bankruptcy court for solicitation in February 2021. In the disclosure, the CRO stated: "As of the Petition Date, the F5 Business Debtor held and currently owns the majority of the current investments made by the FF Fund with monies received from the Limited Partners."

9. Is the defense claiming that it was material that the fund was in bankruptcy but was not in the process of liquidating at the time the complaint was filed? If so, why is it material?

    Yes, it was material. In a Chapter 11 reorganization, the entity filing for bankruptcy must complete a disclosure document addressing four material factors. The disclosure must: (1) satisfy the feasibility test by demonstrating that the entity is solvent, (2) satisfy the best interests test by showing that stakeholders will benefit more from a reorganization than a liquidation, (3) list any outstanding litigation, and (4) identify unresolved claims the entity will pursue for monetization after it emerges from Chapter 11. After the disclosure document is approved by the court for solicitation, the investors review the document and vote on the plan. If the reorganization is confirmed, the GP runs the emerged entity and is responsible for monetizing unresolved claims. In a Chapter 7 liquidation, by contrast, there is no reorganization plan. Instead, a trustee is appointed to run the liquidation and monetize unresolved claims.

A. Did Postal Inspector O'Rourke make any statements about the significance of the statement in the complaint that the fund was in liquidation at the time of the complaint's filing?

No, but given the nature of a Chapter 7 liquidation, the significance of O'Rourke's misstatement was implicit. By misrepresenting that the Fund was in liquidation, O'Rourke falsely suggested that the Fund was insolvent and that a liquidating trustee had been appointed to replace the GP as current management. O'Rourke's misstatement about the liquidation also enabled him to omit information about the court-approved reorganization process, including the disclosure document and its acceptance by 89 of 91 voting stakeholders.

B. Did Inspector O'Rourke ever state that the bankruptcy court had made a finding of negligence or wrongdoing?

No, but in incorporating the misstatement that the CRO was court appointed as opposed to court approved, he suggested it. In a Chapter 11 reorganization, a trustee is appointed only if the court deems the current management corrupt or incompetent. *See* "The Bankruptcy Players," Dept. of Justice, Civil Resource Manual, available at: https://www.justice.gov/jm/civil-resource-manual-48-bankruptcy-players-outline.

C. Did Inspector O'Rourke ever state or opine "that the liquidation was precipitated by Mr. Franzone's alleged wrongdoing"?

No, but he suggested it by falsely implying that the Fund sought Chapter 7 protection in September 2019 because it could not meet redemptions (totaling $38 million) and by linking its purported inability to pay redemptions to its alleged wrongdoing.

10. Between June 2019 and the fund's filing for bankruptcy on September 24, 2019, did the fund fulfill any redemption requests? If so, is that fact in the record before me?

No, the Fund did not fulfill redemption requests during that period. Redemption requests were submitted quarterly on March 31, June 30, September 30, and December 31. The redemption requests submitted before December 31, 2018, became redemption payables on March 31, 2019. Those had already been paid. The $1.2 million in requests submitted before March 31, 2019, became

redemption payables on June 30, 2019, but the wind down was announced on July 25, 2019, before finalization of the net asset value numbers necessary for payment. And the wind down announcement superseded the $38 million in requests submitted before June 30, 2019, making the redemption effective date of September 30, 2019, no longer applicable.

11. By the time Inspector O'Rourke's affidavit was submitted in connection with the Google search warrant, was it known to the Government that the bankruptcy petition was not filed in June 2019 but was filed in September 2019? If so, why was this mistake not corrected in Inspector O'Rourke's affidavit?

    This question is addressed to the government.

12. By the time Inspector O'Rourke's affidavit was submitted in connection with the Google search warrant, was it known to the Government that the fund was not in process of liquidating at the time the complaint was filed? If so, why was this mistake not corrected in Inspector O'Rourke's affidavit?

    This question is addressed to the government.

13. Did Inspector O'Rourke ever state in his affidavit that the CRO was appointed or approved to replace Franzone in any capacity at the fund?

    O'Rourke did not state that the CRO replaced Mr. Franzone, but it was implicit in the misrepresentation that the CRO was court appointed rather than court approved. As stated above, in a Chapter 11 reorganization, a trustee is not appointed unless the court deems the current management corrupt or incompetent. *See* "The Bankruptcy Players," Dept. of Justice, Civil Resource Manual, available at: https://www.justice.gov/jm/civil-resource-manual-48-bankruptcy-players-outline. As the Court is aware, the court-approved CRO did not replace Mr. Franzone. On the contrary, Mr. Franzone worked alongside the CRO to prepare a reorganization plan, and he became a co-proponent and sponsor of the plan.

14. Did Inspector O'Rourke state and/or opine in his affidavit that "the bankruptcy judge had assigned a CRO to replace Mr. Franzone as the fund's General Partner ("GP") after a finding or negligence or wrongdoing."?

No, but for the reasons stated in response to Question 13, that statement or opinion was implicit in the misrepresentation that the CRO was court appointed rather than court approved.

15. Is it factually accurate that the defendant provided investors with monthly "performance reports" attached to emails from his Google email address?

    Even assuming the government can establish that a handful of monthly performance reports were provided as email attachments, the default option for investors was to access the reports by logging directly onto the IntraLinks portal.

16. Did Inspector O'Rourke ever state in his affidavit that the only way investors received copies of "performance reports" was by Franzone sending copies using his Google email address?

    O'Rourke did not state that the "only way" investors received performance reports was by email, but he implied it by omitting to mention the IntraLinks portal.

17. Is it undisputed that Stuart Shikiar was a Registered Investment Advisor ("RIA")?

    Mr. Franzone has not met Mr. Shikiar and cannot confirm that he was or is a Registered Investment Advisor.

18. Do RIAs make investment recommendations to clients?

    Yes.

19. Under certain circumstances, can RIAs make investments on behalf of clients?

    Yes.

20. Is the misstatement related to the Shikiar email that Shikiar is described as a "prospective investor"?

    Yes, it was a misstatement to describe Shikiar as a "prospective investor" merely because he was an RIA. The Fund used RIAs for various additional reasons, including to provide administrative and operational assistance and investment sourcing.

A. In order to be a "prospective investor" would Shikiar have to have met Franzone before receiving the email?

   Yes, the fund was required to perform suitability and KYC analyses before individuals or entities could invest.

B. Did Franzone state in his email that he was "just trading on the screens throughout all of the days"?

   Yes, and there is evidence of his trading during this period.

C. During Investor-2's deposition and/or in Investor-2's affidavit submitted in connection with a litigation, did Investor-2 state in words or substance that Franzone had admitted to Investor-2 and Investor-3 during a meeting in 2019 that the fund "had not engaged in securities trading for the prior two years."? *(See* Doc.1 ¶ 12b.)

   Investor-2 stated in an affidavit that sometime after March 2019, Mr. Franzone told Investor-2's husband that "the Fund was very illiquid, and he had not been trading for two years."

   In the same affidavit, Investor-2 stated that in 2015 or 2016, she and her husband requested a $75,000 redemption from the Fund and "received the funds directly from Andrew." That statement was false. The Fund paid the $75,000 redemption, not Mr. Franzone. Investor-2's false statement was repeated in the Complaint, which was incorporated by reference into O'Rourke's affidavit. *See* Doc. 1 ¶ 8(e) ("FRANZONE promptly sent Investor-2 the funds.").

D. During a meeting on or about April 30, 2019, between Franzone and Wealth Manager-1, did Inspector O'Rourke learn that Franzone told Wealth Manager-1 during that meeting that the fund "had not engaged in public securities trading since January 2018."? *(See* Doc. 1 ¶ 11.)

   Wealth Manager-1 stated in an affidavit that Mr. Franzone said the above during an April 2019 meeting.

21. Are there any cases where a court has suppressed evidence seized from a defendant's Google applications based on the argument that the search warrant affidavit only related to one Google application?

The defense has not found cases directly on point, but the Eleventh Circuit's holding in *United States v. Blake,* 868 F.3d 960, 973 (11 Cir. 2017), is instructive. The Court held that two warrants requiring Facebook to disclose "virtually every kind of data that could be found in a social media account" were unnecessarily broad. Regarding private messages, for example, the Court stated that the warrants could have restricted the searches to include messages sent or received from persons suspected of wrongdoing and should have limited the data requested to the period of alleged criminal activity. *Id.* at 974. The Court concluded that "[d]isclosures consistent with those limitations might then have provided probable cause for a broader, although still targeted, search of Moore's Facebook account." *Id.* Ultimately, the Court declined to suppress the warrants because it determined that they fell under the good faith exception. *Id.* at 975.

In *United States v. Shipp,* 392 F.Supp.3d 300 (E.D.N.Y. July 2019), cited in the defense briefing, Judge Garaufis also held that a Facebook warrant was overbroad. The warrant required Facebook to disclose sixteen categories of information, a "seemingly boilerplate list apparently designed to capture all information associated with the account." *Id.* at 310. Judge Garaufis observed that "perhaps more than any other location—including a residence, a computer hard drive, or a car—Facebook provides a single window through which almost every detail of a person's life is visible. Indeed, Facebook is <u>designed</u> to replicate, record, and facilitate personal, familial, social, professional, and financial activity and networks." *Id.* at 308. The same is true for a Google account.

Judge Garaufis further stated that: "Facebook is different from hard drives or email accounts in many ways, including that the information associated with the account is categorized and sorted by the company—not by the user. For this reason, Facebook is less like other areas of the 'digital realm, where the size or other outwardly visible characteristics of a file may disclose nothing about its content' and more akin to a physical location. *Id.* at 309 (citation omitted). Again, the same is true for a Google account.

Judge Garaufis thus concluded that:

> [c]ompared to other digital searches … Facebook searches both (1) present a greater 'risk that every warrant for electronic information will become, in effect, a general warrant,' and (2) are more easily limited to avoid such constitutional concerns. In light of these considerations, courts can and should take particular care to ensure that the scope of searches involving Facebook are 'defined by the

> object of the search and the places in which there is probable cause to believe that
> it may be found.'

*Id.* at 309-10 (citations omitted). Ultimately, he declined to suppress the warrant because he determined that it fell under the good faith exception.

22. Are there any cases where a court has denied a suppression motion for evidence seized from a defendant's Google applications where a defendant argued that the search warrant affidavit only related to one Google application?

    Juge Caproni considered a similar—albeit more limited—warrant in *United States v. Garlick,* 22 Cr. 540 (VEC), 2023 WL 2575664 (S.D.N.Y. Mar. 20, 2023). The government obtained a warrant directing Google to produce the contents of Garlick's email account, his Google Chrome browser activity, and his search history records. *Id.* at *3. Notably, the warrant *did not order* Google to produce the contents of other Google applications. The defense contended that the warrant was overbroad and lacked sufficient particularity because, among other reasons, it gave the government "unbridled discretion to search Defendant's online accounts," sought information about which the government "offered no case-specific facts," and "authorized the limitless search and seizure of Defendant's online accounts instead of tailoring searches to the case." *Id.* at 9. Judge Caproni held that the warrant was not overbroad because it set forth probable cause to believe that the online account contained evidence of the offense and was limited to a specific time period. *Id.* at 9-10. Citing various cases, including those authorizing the searches of email accounts, Judge Caproni further noted that courts in the Southern District have "routinely sanctioned the Government's ability to obtain from the provider 'an entire' online account." *Id.* at 11.

    *United States v. Vogelbacher,* 20 Cr. 098 (LJV), 2021 WL 1017126, at *2 (W.D.N.Y. Feb. 2, 2021), is also noteworthy. The warrants at issue required disclosure of the defendant's Facebook and Google accounts. The court held that the warrants were supported by probable cause sufficient to authorize searches of the accounts "for the specified time periods" and noted that the victim had employed "multiple forms of communication," including Google hangouts, email and Facebook Messenger. *Id.* at *3.

    *See also United States v. Pedrosa,* 21 Cr. 20259, 2022 WL 20056290, at * 13 (S.D. Fla. Sept. 9, 2022) (in child pornography case, denying on good faith grounds suppression of a broad Google warrant that lacked a date limitation and noting that courts have

long recognized "the longevity and durational nature" of pornography offenses); *People v. Cindy Tappe,* IND-74845-2022 (April 25, 2023) (denying suppression of broad Google warrant because "the items to be searched are described with sufficient particularity and the warrant includes an illustrative list of seizable items which properly limits the scope of the warrant").

23. Where in the defense papers, if anywhere, does the defense argue that the good faith exception to the exclusionary rule does not apply to this case?

    The defense addresses the good faith exception on pages nine and ten of its reply brief. In particular, the defense explains that, while the warrant included factual allegations regarding Mr. Franzone's use of his email account, it was so lacking in probable cause as to the non-email applications that the agents' reliance on it was "unreasonable." *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992) (good faith exception does not apply where "the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable.").

    The defense also discusses the Second Circuit's decision in *United States v. Falso*, 544 F.3d 110 (2d Cir. 2008), a case cited by the government. In *Falso*, the Second Circuit held that the good faith exception applied to a warrant the majority of panel members believed lacked probable cause because the evidence was at least sufficient to spark "different approaches" to the probable cause analysis among the judges. *Id.* at 128. *See also United States v. Leon,* 468 U.S. 897, 926 (1984) (applying good-faith exception where the affidavit "provided evidence sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause."). The O'Rourke Affidavit, by contrast, was entirely devoid of evidence connecting the various non-email applications to Mr. Franzone's alleged criminal activity. Thus, there could be no disagreement among judges, let alone among agents steeped in the instant investigation.

    Thank you for your consideration.

    Respectfully submitted,

    /s/

    Deborah Colson
    Peter Ginsberg
    Benjamin Silverman