N9QCfraO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          21 Cr. 446 (VSB)

ANDREW FRANZONE,

            Defendant.

------------------------------x

                                        New York, N.Y.
                                        September 26, 2023
                                        2:00 a.m.


Before:

                HON. VERNON S. BRODERICK,

                                        District Judge

                        APPEARANCES

DAMIAN WILLIAMS,
        United States Attorney for the
        Southern District of New York
BY:  KIERSTEN FLETCHER
        Assistant United States Attorney

DEBORAH COLSON
        Attorney for Defendant

1          (Case called)

2          THE COURT:  If I could ask counsel to please identify

3     themself for the record.

4          MS. FLETCHER:  Good afternoon, your Honor.  Kiersten

5     Fletcher for the government.

6          THE COURT:  Good afternoon.

7          MS. COLSON:  Good afternoon, your Honor.  Deborah

8     Colson for Mr. Franzone.  I'm also joined by Ben Silverman, who

9     has decided to sit in the audience because he has to leave

10    early.

11         THE COURT:  It wouldn't disturb me.  It's up to you if

12    you want to sit at counsel table, but that's fine.

13         So this matter is on today for oral argument on the

14    motion related to the Google search warrant.  I note that the

15    parties have indicated a desire and I think it makes sense to

16    set a trial date.  So I want to talk about that first because

17    there are several options.  One is I have a civil case, which

18    is scheduled to start a four-week trial on May 6th.  It's been

19    pending for a while.  I could double-book, but what I suggest

20    is the following:  We should schedule something in June and if

21    that case goes away and the parties are available, I can move

22    this trial date to May 6th if that works.

23         First, would a date in June work for the government?

24         MS. FLETCHER:  The government's fine with May or June.

25         THE COURT:  Ms. Colson.

1      MS. COLSON:  Your Honor, we are available in June.  I

2  think, though, that we would prefer not to set a trial date

3  today.  It's the government's wish to set the trial date.  Our

4  preference would be to have these motions resolved first.

5  There's also an additional motion we are considering filing.

6  And so --

7      THE COURT:  Okay.  I guess I don't have a problem --

8  well, let me ask this question, and I'm not in any way

9  indicating how I might rule.  If I rule in the favor of the

10  defense on all of the information that they've requested, I'm

11  just trying to gauge whether the government would still go to

12  trial.

13      MS. FLETCHER:  Yes, your Honor.  The motions, while

14  important, are not dispositive and the government has

15  sufficient evidence, in its view, to proceed to trial, even if

16  the Court suppresses all of the evidence that's the subject of

17  the pending motions.

18      THE COURT:  My concern, Ms. Colson, with not setting

19  something is that people's calendars will fill up and then it

20  will push it out even further.  I believe I've got things that

21  are later in the summer and the fall, so I would like to put

22  something in the calendar now so that if either of you are in

23  front of another judge and the judge wishes to set a trial

24  date, you can let the judge know you're already occupied during

25  that time period.  I know some of my colleagues do double-book,

but what that would mean is if -- well, why don't we set it

down for June, and if it turns out the May trial goes away, I

can see whether the parties are available.

So my May trial is scheduled to be three or four

weeks, I think it's probably more around two, but why don't we

say that we would start sometime in the first week or the

second week of June.

What is the second week of June?

THE DEPUTY CLERK:  June 10th.

THE COURT:  So June 10th.

Ms. Colson, does that work for your schedule?

MS. COLSON:  Yes, it does.  Thank you.

THE COURT:  So we'll set this matter on for June 10th.

As soon as I find out about the May trial, I'll let the parties

know, and if you're available and want to accelerate the trial,

I obviously don't have an objection to that.  That other case,

I'm not sure because it actually may be one of the rare civil

cases that ends up going to trial in light of the allegations

in the complaint that have survived summary judgment.

So my plan was to go through the questions that I had

placed in the order, see if there's any amplification.  I did

receive, Ms. Colson, your September 25th letter with responses

to the questions, see if the government has any comments on any

of the issues I inquired about.  I do have some followup

questions as we go through.  In regard to the Google motion,

1    I'll let the parties either emphasize or make any points that

2    they wish to in regard to their papers or make any other points

3    that they think are salient to the motion.

4         Now, with regard to the speedy trial clock, I'm going

5    to exclude the time between now and our June 10th trial date.

6    I'll issue an order with regard to *voir dire* and requests to

7    charge, motions *in limine* and the like, and also in that order

8    schedule a final pretrial conference for the case.

9         I'm going to exclude the time between now and

10   June 10th from the time within which Mr. Franzone would have to

11   be brought to trial.  I find that that exclusion outweighs the

12   interests of the public and Mr. Franzone in a speedy trial.

13   That time is necessary for me to complete the review and

14   decisions on the outstanding motions, but also allow counsel to

15   prepare for trial on June 10th.

16        Yes.

17        MS. FLETCHER:  Sorry, your Honor.  While we're still

18   on the matter of scheduling and the scheduling order, I heard

19   Ms. Colson say she's contemplating an additional motion.

20        THE COURT:  Right.  What is the nature of the

21   additional motion, Ms. Colson?

22        MS. COLSON:  We haven't decided yet, but it's possible

23   we would like to file a motion for disclosure of the grand jury

24   minutes.  So not an extensive motion.

25        THE COURT:  Just so I'm clear, when you say you

1    haven't decided, you haven't decided whether or not to file

2    that motion or are there other motions that are --

3              MS. COLSON:  No, whether or not to file that motion.

4              THE COURT:  All right.  Again, I don't know what the

5    underlying basis would be, but what's the timing of that?  In

6    other words, when do you think you'll make the decision with

7    regard to that?

8              MS. COLSON:  I think, your Honor, if we could set a

9    date for that motion now, sometime in November.  We will let

10   the Court know long before that whether we intend to file the

11   motion.

12             THE COURT:  You said sometime in November?

13             MS. COLSON:  If we could set a date for the motion in

14   November and we'll let the Court know before that whether we

15   intend to file the motion.

16             THE COURT:  And you don't need to tell me if it's not

17   fully baked, but is there some impropriety that you believe

18   occurred in the grand jury?

19             MS. COLSON:  Your Honor, it's definitely not fully

20   baked, in part because we're still getting a grasp on the

21   discovery in this case, which is quite voluminous.

22             THE COURT:  If we could get a date in November.  Why

23   don't you make it early November.

24             THE DEPUTY CLERK:  November 6th.

25             THE COURT:  So November 6th for the opening motion.  I

1  know in two weeks, there's going to be Thanksgiving.  So let me

2  ask Ms. Fletcher, when do you think you'd be able to get an

3  opposition in?

4              MS. FLETCHER:  Thank you, your Honor.

5              Perhaps a date in early December.

6              THE COURT:  Ms. Disla.

7              THE DEPUTY CLERK:  December 4th.

8              MS. FLETCHER:  That's fine, your Honor.  Thank you.

9              THE COURT:  Ms. Colson, on reply?

10             MS. COLSON:  Two weeks after that, your Honor.

11             THE DEPUTY CLERK:  December 18th.

12             THE COURT:  December 18th.

13             So we'll have opening motions, to the extent there is

14  a motion, November 6th, any opposition December 4th, and

15  replies December 18th.

16             I don't think there's a connection, but as you're

17  considering the motion, Ms. Colson, is there any connection

18  between -- I don't know who the witness or witnesses were in

19  the grand jury, but any connection that you see between the

20  current motions and the one you're considering?

21             MS. COLSON:  Yes.  Obviously we don't know who the

22  witnesses were in the grand jury either, but we suspect we

23  know.  And so, yes, there is a connection.

24             THE COURT:  I'm going to proceed with these motions,

25  and then if I need to revisit something, I can do that,

1    obviously.

2            MS. COLSON:  Okay.

3            THE COURT:  All right.  So with regard to the first

4    question, that was just a question about the *Hersch v. FF Fund*

5    litigation.

6            Let me ask, I don't remember and it only occurred to

7    me, so I didn't look through the papers, was the complaint in

8    the civil case referenced in the complaint in the criminal case

9    or in the search warrant affidavit?

10           MS. FLETCHER:  Not explicitly, no.  Maybe this is what

11   your Honor's question is getting at.  Some of the allegations

12   in that complaint are similar to the allegations that the

13   wealth manager conveyed to the government that are conveyed in

14   the complaint, but the affidavit I don't believe, your Honor,

15   incorporates a review of the filings in that case by reference.

16           THE COURT:  Ms. Colson, anything to add with regard to

17   the response of question 1?

18           MS. COLSON:  No, your Honor.

19           THE COURT:  With regard to question 2, why is the

20   status quo order sought?  My understanding, am I correct,

21   Ms. Colson, that the status quo order was a stipulation between

22   the parties?

23           MS. COLSON:  Well, at the end, yes, your Honor, but

24   initially, my understanding of the Delaware case was that the

25   trust was attempting to control the wind-down process initially

1    by appointing a receiver or having a receiver appointed.  When

2    that wasn't successful, it was the trust that sought the status

3    quo order.  At the end of the day, the parties agreed to the

4    basic terms of the order with the exception of whether

5    attorneys' fees would be paid, and that was decided by the

6    court.

7          THE COURT:  In other words, I understand that,

8    initially, the approach that was sought by the plaintiff in

9    that litigation, the court denied that or I guess it was a

10   hearing, but that, eventually, the parties reached an

11   understanding, and that understanding is documented in the

12   status quo order.  I mean, it's something that I understand

13   being Delaware is something that is, I don't want to say

14   common, but it is something that parties use.  What I'm getting

15   at is, it seems like there was an agreement that was reached.

16         MS. COLSON:  May I have a moment?

17         THE COURT:  Sure.  Absolutely.

18         (Pause)

19         MS. COLSON:  Just to clarify, I believe that the

20   parties did ultimately agree to the status quo order, but it

21   certainly wasn't the fund's choice, and I would have to further

22   research the details, but it's my understanding that the fund,

23   at the time that it agreed to the status quo order, did so

24   reluctantly because it felt that it was its best option at that

25   point.

N9QCfraO

1        THE COURT:  Is that because the other option was

2   involuntary petition for bank -- in other words --

3        MS. COLSON:  Are we talking about the status quo order

4   or the bankruptcy?

5        THE COURT:  The bankruptcy was filed two weeks or

6   three weeks after the status quo order.

7        MS. COLSON:  Yes.

8        THE COURT:  As I understand it, there were no

9   transactions attempted under the status quo order.

10        MS. COLSON:  That's right.

11        THE COURT:  Ms. Fletcher, and I apologize for

12   backtracking, how long does the government anticipate its case

13   in chief to be for the trial?

14        MS. FLETCHER:  Yes, your Honor.  Somewhere between one

15   and two weeks.

16        THE COURT:  Thank you.

17        Obviously I'm not going to ask Ms. Colson because you

18   don't necessarily know right now, but in my calendar, I'll set

19   it down for at least a two, probably three-week trial.

20        Let me ask, Ms. Fletcher, do you have anything with

21   regard to question 2?

22        MS. FLETCHER:  No, your Honor.

23        And just generally, with respect to the reasons for

24   seeking the status quo order, the Court's questions related to

25   the "why" for some of what was happening in the civil

litigation.  I think the government, our response with respect

to question 2 is the same as it would have been with respect to

question 1, which is that's broadly consistent with our

understanding, but I cannot profess to have followed every

detail of the civil litigation.

THE COURT:  I think question 3 is answered, right,

there were no transactions.  There was no effort to seek

permission for transactions over $50,000 between the filing of

the status quo order on September 6th and then the filing of

bankruptcy two weeks later.  I understand there was a carve out

for legal fees.

Anything further, Ms. Colson, with regard to this?

MS. COLSON:  No.

THE COURT:  And anything from the government?

MS. FLETCHER:  With respect to question 3, no.

THE COURT:  So question 4 deals with redemption

requests.  As I understand it, there were three and then some

additional ones thereafter.

Let me ask, Ms. Colson, anything further to add to

that question?

MS. COLSON:  No, your Honor.

THE COURT:  In connection with question 6, which is

also related to the status quo order and the question about if

the fund had money to fulfill the redemption requests, could it

have.  So am I correct that at the time that the redemption

1    requests were made, the fund did not have the liquidity to make

2    the payments on those requests?  Putting aside when they might

3    have come due, do you know whether or not the funds had

4    liquidity?  In response to question 6, it says the liability

5    totaled millions of dollars, I'm not sure how much that is, but

6    exceeded the amount of liquidity on hand.

7          MS. COLSON:  The external facing liabilities I believe

8    totaled somewhere close to $8 million, which exceeded the

9    amount of liquidity on hand, but the fund was not required to

10   satisfy redemptions in cash, it could have done so in kind.

11         THE COURT:  In kind by issuing shares of -- when you

12   say "in kind," what do you mean by that?

13         MS. COLSON:  Well, the fund had made a variety of

14   private investments.  And so, it could have given investors

15   their percentage of the share in those private investments.

16         THE COURT:  I see what you're saying.  All right.

17         Anything else with regard to question 4?

18         MS. FLETCHER:  Your Honor --

19         THE COURT:  I'm sorry.  Ms. Colson, I thought you had

20   said no, but maybe I missed that.

21         MS. COLSON:  I don't have anything else with respect

22   to question 4, no.

23         THE COURT:  Yes, Ms. Fletcher.

24         MS. FLETCHER:  Thank you, your Honor.

25         So I don't know if it's strictly in response to

question 4, but I think the sequence of events here and what

the investors in the fund understood is I think important for

the government -- important to convey to the Court for the

government's sort of understanding of the facts and what

investors understood they were entitled to.

So, in general, the government's case is based on this

notion that investors, including the largest investor, which

was the Linden West trust, believed that the defendant was

engaged in trading in highly liquid securities and other

instruments, and did not believe and did not understand him to

be directing their funds to these highly illiquid private

investments that it now appears he did direct those funds to.

And so, in the government's view, the wealth manager came to

understand that, in fact, the defendant had not done with

investor funds what he had represented he would do, the wealth

manager submitted this series of redemption requests that's

reflected in item 4.

Putting aside whether I think the redemption requests

could have been satisfied in kind in theory, what the

redemption requests requested was their funds back, and the

fund was not in a position to satisfy the redemption requests

in cash.

As we understand the facts, the defendant did direct

investor funds to private investments, some of which were then

worthless, others were not easily valuable, which goes to some

1  of the forthcoming questions.  But, in any event, these

2  redemption requests made in June effectively made the fund

3  insolvent and that sort of animated the events that took place

4  over the next several months.

5          THE COURT:  Ms. Colson.

6          MS. COLSON:  Yes.  I mean, a lot of what Ms. Fletcher

7  just said I think is going to be sort of the issue at the

8  trial.  It is Mr. Franzone's contention, obviously, that the

9  fund was not insolvent, that these private investments did have

10  value to them, and that the offering documents I think clearly

11  state that you can satisfy redemptions with in kind payments.

12  So those are mere allegations and they haven't been proven yet

13  and they will be the subject of the trial.

14          THE COURT:  But aren't certain of those assertions,

15  some of those facts contained in the complaint and in the

16  search warrant affidavit?  In other words, what the government

17  contends people said, and I think I go through some of that,

18  what the government contends people said are depositions or

19  affidavits that they submitted.  So I understand it's the

20  government's contention, but at least some of it is based upon

21  statements by other witnesses, other than the postal inspector.

22          MS. COLSON:  That's correct.  I'm not sure exactly

23  what you're referring to, but that is correct, that the

24  complaint largely draws on statements or affidavits made by I

25  believe two or three investors in the fund.  But, one of the

1    government's main contentions, obviously, is that the fund was

2    insolvent and that they're able to demonstrate that because it

3    was not able to satisfy redemptions.  That is not accurate.

4    The fund was able to satisfy redemptions, it could have made

5    those redemptions in kind, and that will be proven at a trial.

6         THE COURT:  I guess the question that I'm grappling

7    with is do you have the status quo order that provided a means

8    by which operations could continue?  And that wasn't done, it

9    wasn't even attempted.  So why am I not to infer from that that

10    was basically what was going on here, is that they entered into

11    the status quo order knowing at the time they entered into it

12    they were going to file for bankruptcy?  In other words, that

13    they believed that at the time, as you said -- well, whether

14    they believed at the time that it was such an impediment that

15    they couldn't move forward or some other combination of things?

16    Again, this isn't a question that necessarily can be answered.

17    There wasn't an attempt to even try and make a request to have

18    payments done.  And I recognize the redemptions may not have

19    technically become due yet, so it would have been other

20    payments of the business, but that wasn't done.  So there

21    wasn't even an attempt if there is/was liquidity in the sense

22    of in kind.

23         Let me ask, separately, do you know whether — I think

24    I know the answer to this — there were efforts at some other

25    point in time to satisfy, because my understanding is the

1  redemption requests weren't satisfied, but were there attempts

2  to satisfy them with the private investments in lieu of cash or

3  cash equivalent?

4  　　　　　MS. COLSON:  It's highly complicated, your Honor, but

5  my understanding is there were discussions with the trust

6  before the Delaware litigation commenced about satisfying those

7  investments in kind.  Obviously, the parties didn't reach an

8  agreement as to that.

9  　　　　　THE COURT:  I recognize that because it's tied up with

10  the civil litigation and the bankruptcy in particular, there

11  may have been a negotiation that was occurring to try and

12  resolve the issue that included exactly what you're saying.

13  　　　　　MS. COLSON:  And also, just to be clear, it is my

14  understanding that once Mr. Franzone or the fund retained

15  bankruptcy counsel, they were actually advised not to make any

16  payments.  And so at that point it wasn't his choice, he was

17  acting on the advice of counsel.

18  　　　　　THE COURT:  Was bankruptcy counsel retained prior to

19  the status quo order, do you know?

20  　　　　　MS. COLSON:  Yes, bankruptcy counsel was obtained

21  prior to the status quo order.

22  　　　　　THE COURT:  So you're concerned about fraudulent

23  conveyances and other things.  Okay.

24  　　　　　Let me ask, Ms. Colson — and this is far afield, it's

25  something you probably don't necessarily have the answer to

1    right now — is there going to be some form of advice-of-counsel

2    defense in connection with this case?

3              MS. COLSON:  I do not know.

4              THE COURT:  I expected that would be the case.

5              So question No. 5, it sounds like it's not only that

6    the status quo order was restrictive, but that there was advice

7    being given that no money should be paid out.  Whether that be

8    pursuant to the status quo order or otherwise, it sounds like

9    that's the advice that was being given.

10             MS. COLSON:  That's correct.

11             THE COURT:  So No. 6, as I understand the response to

12   this question, Ms. Colson, is the fund at the time -- I'm

13   sorry.

14             So the external facing liabilities, including capital

15   calls and expenses.  Are the capital calls the redemptions or

16   they're something else?

17             MS. COLSON:  No, your Honor.

18             THE COURT:  Do you have a sense of what the capital

19   calls and expenses were?

20             MS. COLSON:  I do.  I believe they totaled

21   approximately $8 million.

22             THE COURT:  That's the $8 million that you were

23   referring to before.

24             And so, those would have had to have been paid before,

25   as you understand it, the redemptions?

1          MS. COLSON:  That's correct.

2          THE COURT:  And those, I take it, would not have been

3     able to be satisfied by in kind payments, that had to be cash?

4          MS. COLSON:  It had to be cash.

5          THE COURT:  Or a cash equivalent.

6          At this time, the liabilities, in other words, they

7     didn't have cash on hand to pay their bills, basically?  In

8     other words, enough cash to pay -- so the capital calls were

9     basically, it's time for you to pony up additional money with

10    regard to investments.  Is that an accurate statement?

11         MS. COLSON:  With respect to private equity.

12         But I just want to make one thing clear about the

13    external facing liabilities.  As far as I understand it, those

14    did not have to be paid right away, all of them.  So they

15    didn't have to have the cash on hand to pay all of those.  It

16    just became complicated because once the fund announced the

17    wind down, they were required to pay the external facing

18    liabilities first.  So that then put pressure on them to pay

19    those immediately, but before they announced the wind down,

20    they were not under the same pressure to pay all of the

21    external facing liabilities immediately.

22         THE COURT:  Ms. Fletcher, do you have anything to add

23    with regard to that?

24         MS. FLETCHER:  No, your Honor, except to just say

25    that, and I know that your Honor knows this, but these

1   questions I think are designed to get at whether the postal

2   inspector's statements in the warrant affidavit were in

3   statements he received from other witnesses and information

4   provided by other witnesses.  And I think, given the sequence

5   of events, that is a series of redemption requests made to the

6   fund and the fund's decision to file bankruptcy within a matter

7   of months and not pay the redemption requests, it was -- the

8   conclusions of Inspector O'Rourke in the affidavit are wholly

9   reasonable in light of just the series of events.

10         THE COURT:  So question 7, as I understand it, that

11   the chief restructuring officer did attempt to locate and

12   verify the existence of assets.

13         So did the chief restructuring officer basically come

14   up with a tally of the existing assets and is that part of any

15   of the information that's currently before me?

16         MS. COLSON:  Your Honor, it's my understanding that he

17   did list the assets.  So he verified their existence and listed

18   them, but the value he attached to them was the historical

19   value and not the current value.

20         THE COURT:  And by historical value, does that mean

21   tied to purchase price or do you not know exactly?

22         MS. COLSON:  I don't know exactly.

23         THE COURT:  Ms. Fletcher, anything with regard to 7?

24         MS. FLETCHER:  So, your Honor, I think what the CRO

25   did was identify the assets, and this is I think addressed in

1  the next question, but identified the assets, came to

2  understand how the defendant had marked the assets, meaning the

3  value assigned to the individual assets by the defendant, and I

4  think he did undertake some efforts to try to verify whether

5  that valuation was correct or incorrect, but he was not

6  successful in sort of concluding that the valuation provided by

7  the defendant was correct or incorrect with respect to many of

8  them.

9          MS. COLSON:  Your Honor, just to respond, because I

10  was taking a look at the CRO's deposition in a civil litigation

11  recently, he stated very clearly during his deposition that he

12  did not attempt to value the assets.

13          THE COURT:  Did he say why?

14          MS. COLSON:  Because of the unique nature of these

15  investments, that they were private investments in private

16  companies, some of which were quite small.

17          THE COURT:  Did he come to the conclusion that some of

18  them were worthless?

19          MS. COLSON:  I don't know the answer to that, but I

20  don't think so.  I can't answer that question right now.  There

21  were 49 investments.  I'd really have to look at them one by

22  one.

23          THE COURT:  That's fine.  It wasn't one of the

24  questions I posed.

25          So I'm not sure I understand, in response to

1    question 8, you indicate the CRO stated that the fund was the

2    owner of F5 Business and the indirect owner of the assets of

3    F5 Business, and then made I guess what is a similar statement,

4    that the F5 Business debtor held and currently owns the

5    majority of the current investments made by the FF Fund with

6    monies received from the limited partners.

7              So what was the entity that held 80 percent of the

8    fund's assets as of 2018?

9              MS. COLSON:  The F5 is the entity that owned

10   80 percent of the assets and the fund owned F5.

11             THE COURT:  When you say the "fund owned F5," who

12   created F5?

13             MS. COLSON:  Your Honor, the answer to that question

14   is highly complicated.  We could try to answer it in writing

15   after this hearing, but I think it's too difficult for me

16   without doing a little more research to answer it orally now.

17             THE COURT:  That's fine.  Look, some of these

18   questions you may not want to answer because of any number of

19   reasons, and I understand that.  If you'd like to submit

20   something after hearing, that's fine, we can talk about a

21   schedule for that at the conclusion of the argument.

22             Ms. Fletcher, would you like to be heard with regard

23   to question 8?

24             MS. FLETCHER:  Yes, your Honor.

25             So, there's the FF Fund, which is the fund for which

1    investors received limited partnership interests.  Investors

2    controlled the -- investors have an interest in the main

3    FF Fund.  What the CRO learned after the fund filed for

4    bankruptcy was that all of the assets, the private investments

5    that were purchased or investments that were made using the

6    LP's monies were actually controlled not by FF Fund, but by a

7    separate entity called F5 Investments, and that that entity was

8    controlled solely by the defendant.  So the LPs, the limited

9    partners with an interest in the fund did not actually have an

10   interest in the F5 entity that controlled the fund's assets.

11           My understanding is that after the fund filed for

12   bankruptcy, the CRO, it's not clear to me exactly how this was

13   resolved, but there was an agreement that F5 transferred its

14   assets to the FF Fund for purposes of the bankruptcy.  So I

15   think what is reflected in Ms. Colson's answer here is

16   technically correct, but only beginning in November of 2019.

17           MS. COLSON:  Your Honor, we'll respond to that in

18   writing.

19           THE COURT:  Okay.  With regard to question 9, I think

20   I understand the response.

21           Ms. Fletcher, do you have anything to add with regard

22   to that?

23           Well, first, Ms. Colson, anything to add in regard to

24   the response in question 9?

25           MS. COLSON:  Only that I think the difference between

1    a liquidation and a reorganization is very significant.  It's

2    essentially the difference between the assets being fire sold

3    by a liquidating trustee or being held and run by the GP as a

4    going concern.

5            THE COURT:  I, in a prior life on the litigation side,

6    had some involvement in some bankruptcies, including the Lehman

7    bankruptcy, so I understand that the plan was there was going

8    to be something at the end of the Chapter 11 that would

9    continue.  The idea I guess was it would generate money that

10   could be spun off to satisfy creditors depending upon what the

11   nature of the plan was.  I'm not sure I necessarily agree that

12   under a Chapter 7 it would be a fire sale in part because part

13   of the bankruptcy is designed so that it is more orderly than

14   that.  But having said that, I think I understand the response

15   to the question, question 9.

16           Ms. Fletcher, anything with regard to question 9?

17           MS. FLETCHER:  No.  And I think this addresses maybe

18   the next several questions.  The government's view is that the

19   difference between a liquidation and a bankruptcy was not

20   material to the issuance of the warrant here.

21           THE COURT:  Now, with regard to subsection A to

22   question 9, and just remind me, Ms. Colson, in June, the

23   decision for the wind down, how did that come about?  Part of

24   the issue I think is that you mentioned that the wind down

25   would have required that the payment of the external facing

1    debts be paid first.  So the $8 million became due at that

2    point, I guess in or around June, and the fund, as I understand

3    it, at that time didn't have the money to pay those, but had

4    not yet filed for bankruptcy.  So I guess it was implicit

5    that -- I mean, I'm not sure that I necessarily have to solve

6    the insolvency issue, but if they didn't have the money to pay

7    back, and this is pre-bankruptcy, to pay the monies that had

8    become due because of the June 25th wind down announcement, why

9    doesn't that mean they weren't solvent?  In other words, the

10   announcement comes, they say we're going to wind down.  Part of

11   a wind down process, as I understand it, they need to pay the

12   external liabilities before paying the internal liabilities.

13   So I guess the question perhaps is, was there a plan that they

14   were going to get the $8 million in order to continue to wind

15   down?

16          MS. COLSON:  Your Honor, I think that's a question we

17   need to respond to in writing, as well.

18          THE COURT:  Anything else with regard to subsection A,

19   Ms. Colson?

20          MS. COLSON:  Your Honor, I would just say that it's

21   highly significant and I probably should have characterized

22   this as an omission in my motion, but it's not only that he

23   misrepresented that the fund was in liquidation, but by making

24   that misrepresentation, it enabled him to omit important

25   information about the restructuring.  So I probably should have

1  characterized that as an omission in responding to your

2  question, I realize how significant it was.

3          THE COURT:  And by omission, although not referring to

4  it as a Chapter 7 liquidation, by characterizing it as a

5  liquidation, the omission was not indicating that there was an

6  actual Chapter 11 proceeding going on and what that entailed?

7          MS. COLSON:  That's correct.

8          THE COURT:  Anything with regard to subsection A,

9  Ms. Fletcher?

10          MS. FLETCHER:  Only that the government agrees that

11  the answer to subsection A is no.

12          THE COURT:  With regard to subsection B, anything else

13  with regard to that, Ms. Colson?

14          MS. COLSON:  No, your Honor.

15          THE COURT:  Ms. Fletcher.

16          MS. FLETCHER:  No, except the government would agree

17  that the answer to subsection B is no.

18          THE COURT:  And with regard to subsection C, I guess

19  my question here is that they couldn't meet, my understanding

20  from the responses, they couldn't meet in June of 2019, there

21  wasn't sufficient liquidity to pay the external facing debts,

22  which were $8 million.  And again, would the response to this

23  be the in kind investments that you had referenced earlier?

24  Because the answer is no, the postal inspector didn't opine

25  that the liquidation was precipitated by Mr. Franzone's

1    wrongdoing, but the response was that the suggestion was that

2    they sought Chapter 7 protection in September 2019 because they

3    could not meet the redemptions.  Is that accurate with regard

4    to they couldn't meet the redemptions in cash or cash

5    equivalents at that time?  My understanding is they couldn't

6    pay the liabilities even though they were accelerated.  I

7    understand that by indicating a wind down, those liabilities

8    may have been accelerated or they at least had to be satisfied

9    before the payment of any redemptions.

10            Let me ask, actually, and I may have asked this and I

11   apologize if you said that you were going to respond in

12   writing, but was there some plan concerning the wind down on

13   how the external facing liabilities were going to get paid?

14            MS. COLSON:  Your Honor, there was a plan with respect

15   to the wind down.  We will respond with details, if any, in

16   writing.

17            But just to clarify, again, there's a difference

18   between the external facing liabilities and the internal facing

19   liabilities.  The external facing liabilities did have to be

20   paid in cash, but they did not have to be paid all at once.

21   The internal facing liabilities could have been satisfied in

22   kind.

23            THE COURT:  Okay.  But as I understand it, once the

24   wind down was initiated, the redemptions couldn't be paid until

25   the external facing liabilities were paid?

1          MS. COLSON:  That's correct.

2          THE COURT:  So question 10, I think this was, again, a

3     redemption.

4          I'm sorry, Ms. Fletcher, did I turn to you with regard

5     to C?

6          MS. FLETCHER:  No, but with respect to section C, the

7     government agrees the answer is no.

8          THE COURT:  Okay.  I think I understand the response

9     to question 10.

10          Let me ask, was there a plan of reorganization, a

11     Chapter 11 plan of reorganization that was, if not adopted,

12     proposed or was there still in the process of doing that when

13     Mr. Franzone was arrested?

14          MS. COLSON:  Your Honor, it had been approved for

15     solicitation by the bankruptcy court.  89, I believe, of 91

16     voting stakeholders had voted to approve the plan, and it was

17     scheduled, I believe, for confirmation just days after

18     Mr. Franzone's arrest.  So his arrest interrupted that

19     confirmation process.

20          THE COURT:  Were there any objections to the plan of

21     reorganization that you're aware of?

22          MS. COLSON:  I believe there were, yes.

23          THE COURT:  And the plan of reorganization, how was it

24     structured?  In many Chapter 11s, the reason why an entity is

25     impacted is because there are certain obligations they can't

1    meet and it enables them to manage those.  In other words, do

2    you know what the plan of reorganization contemplated with

3    regard to payouts of any of the -- you indicated that 89 of the

4    91 stakeholders -- I'm not sure exactly what that means.  Does

5    that mean they're creditors or --

6        MS. COLSON:  I think it's both creditors and

7    investors.  The two people who objected just incidentally were

8    wealth manager 1 and investor 1.

9        THE COURT:  Maybe it makes sense, and I apologize if I

10   have this already, if you can just provide me with whatever the

11   plan was of reorganization that was being considered at the

12   time.

13       MS. COLSON:  Okay.

14       THE COURT:  Of those stakeholders, do you know how

15   many were independent investors?  In other words, non-family

16   members, non-people tied to Mr. Franzone?

17       MS. COLSON:  I don't know the exact number, but I can

18   say many.

19       THE COURT:  Ms. Fletcher, anything with regard to

20   question 10?

21       MS. FLETCHER:  No, your Honor, except the government

22   would agree that the answer to question 10 is no.

23       With respect to the stakeholders in the bankruptcy who

24   objected to the reorganization plan as compared to the two --

25   I'm sorry.  I think Ms. Colson is right, the two investors who

1    objected to the reorganization plan were wealth manager 1 and

2    investor 1.

3          Their funds that were purportedly under the management

4    of the fund at the time of the bankruptcy accounted for

5    something like 95 percent of the fund's assets under

6    management.  So you can see, I think Ms. Colson's response to

7    one of the earlier questions, that the redemption request was

8    $33.7 million.  I think, at any given time, the fund's even

9    represented assets under management were something in the

10   35-million range, 35- to 37-million range.  So while it is true

11   that only two of the 91 stakeholders objected to the plan,

12   those two individuals had an outsized proportion of their funds

13   with the fund.

14         THE COURT:  Do you know, in terms of voting for the

15   plan of reorganization, whether it was all weighted?  Was it,

16   just for simplicity, was it one person, one vote, or was it

17   weighted towards the amount that someone had a financial stake?

18         MS. FLETCHER:  I don't know, your Honor.

19         THE COURT:  I'll take a look if you have the

20   Chapter 11 plan.  Again, I'm not at all saying that is

21   necessarily because I -- it's not something that my

22   understanding is that the postal inspector reviewed at all, but

23   I'm just thinking in terms of getting an overall picture of

24   what was going on at the time.

25         MS. COLSON:  Just to clarify, I think the postal

inspector said he reviewed -- he was familiar with the

bankruptcy litigation.  So I'm assuming he actually did review

the plan.

THE COURT:  Yes, Ms. Fletcher.

MS. FLETCHER:  Your Honor, I think the affidavit says

that he reviewed filings in the bankruptcy proceeding.  I don't

think there was ever a representation that he reviewed the

reorganization plan.

THE COURT:  With regard to question 11, with regard to

the issue of June 2019 versus September 2019, Ms. Fletcher, I

guess my first question is, do you have a sense of where June

2019 came from?  For some reason, I have a vague recollection,

I may have asked this before, but I don't remember.

MS. FLETCHER:  No, your Honor.  Let me pull up the

relevant section of the complaint.

Your Honor, here's what I think happened.  I think the

language that's in the complaint is correct, and I think what

we say in our opposition, citing to paragraph 11D of the

complaint, beginning in or about June of 2019, several of

wealth manager 1's clients, including the trust, sent FF Fund

redemption requests.  FF Fund did not fill the redemption

requests and instead filed for bankruptcy protection.  That's,

as I said, paragraph 11D in the complaint.  And that is the

sequence of events as articulated in that paragraph is correct,

that is the sequence of events as Postal Inspector Gannon, who

1  swore out the complaint, affirmed; and as Postal Inspector

2  O'Rourke, who reviewed the complaint, agreed.

3          I think what happened is the date, June 2019, as

4  contained within that paragraph was applied to the date of the

5  bankruptcy in the search warrant affidavit erroneously, but I

6  think that is the source of the error.

7          And to answer your Honor's question, I don't believe

8  that anyone realized that error until Ms. Colson pointed it

9  out.

10         MS. COLSON:  Your Honor, I would just note that in

11 paragraph 14A of the complaint, again, it actually states that

12 the fund filed for bankruptcy in September of 2019, and that is

13 incorrect.

14         THE COURT:  I thought that --

15         MS. COLSON:  That is correct.  I'm sorry.

16         MS. FLETCHER:  That is actually correct.  Yes, your

17 Honor, I think that is correct.  I think the problem is with

18 reference to 11D instead of cross-referencing A, which did, to

19 Ms. Colson's point, accurately set forth the date of the

20 bankruptcy.

21         THE COURT:  My understanding is that the search

22 warrant affidavit included, by reference, the complaint.

23         MS. FLETCHER:  It did.  It did incorporate the entire

24 complaint by reference, but it cited directly to 11D which,

25 again, I think is the source of the error.

1    THE COURT:  Anything else on 11 from either party?

2    MS. FLETCHER:  Your Honor, just to make clear, I think

3  to the extent your Honor is asking if we knew, if the

4  government knew that the bankruptcy petition was filed in

5  September 2019, the answer to that is yes, but I think what we

6  didn't realize, until Ms. Colson pointed it out in her motion,

7  is that the paragraph in the affidavit incorrectly says June of

8  2019.

9    MS. COLSON:  The issue there is, though, in

10  incorrectly stating that the bankruptcy was filed in June, that

11  incorrect statement then allowed Inspector O'Rourke to connect

12  it directly to the inability to pay redemptions because,

13  obviously, the redemption request was also made in June.

14    THE COURT:  When you say "directly," he never stated

15  that.  In other words, my understanding is that because you say

16  implicitly that that's the connection that was being drawn, but

17  in fact --

18    MS. COLSON:  I think he states that the fund was

19  unable to satisfy redemptions and thereafter filed for

20  bankruptcy.  In fact, the government makes the connection

21  itself in its own motion papers.  It is what the government

22  alleges.  So our understanding of O'Rourke's representation, I

23  believe, is exactly what the government meant to imply.

24    MS. FLETCHER:  Your Honor, I think those are two

25  different points.  I think your Honor is correct that Inspector

1    O'Rourke's affidavit does not explicitly link the redemption

2    requests from June of 2019 to the bankruptcy filing.  But I

3    think what Ms. Colson is arguing here is that by including an

4    incorrect date in the affidavit, Inspector O'Rourke created a

5    misimpression that the redemption requests and the bankruptcy

6    were linked.  And the government's response to that is that to

7    the extent that it created -- that his affidavit created the

8    impression that the redemption requests were linked to the

9    bankruptcy, that was not a misimpression.  That was, in fact,

10   an accurate impression that the redemption requests were

11   requests that the fund couldn't satisfy and that these series

12   of events that followed, the civil litigation in Delaware, the

13   status quo order, the wind down, Mr. Franzone's consultation

14   with bankruptcy counsel, and an ultimate decision to file for

15   bankruptcy were all a series of events in a causal chain,

16   essentially beginning with wealth manager 1's confrontation of

17   the defendant, the discovery of the defendant's fraud, an

18   effort to get investor money out of the fund, that effort being

19   unsuccessful, and ultimately there being a bankruptcy.

20        MS. COLSON:  Obviously, we dispute that description of

21   events, starting with the fund's inability to meet redemptions.

22   And as we stated previously, and can go into more detail in

23   writing, the fund was in negotiations with investor 1 to

24   satisfy redemptions in kind.  Those negotiations did not prove

25   fruitful and that's what ultimately led to the wind down

1     announcement.

2           THE COURT:  So I think I understand.  Let me ask,

3     question 12, Ms. Fletcher, I think I understand, based upon the

4     response to question 11, what may have transpired.  In terms of

5     the liquidation, what is the express language in the complaint?

6           MS. FLETCHER:  So, your Honor, I think the complaint

7     in paragraph 11D does make clear that the fund filed for

8     bankruptcy, but to Ms. Colson's point, in 14A described the

9     fund as being in the process of being liquidated.  Your Honor,

10    I think that's the error that was pointed out in the earlier

11    motion to suppress round of briefing.

12          So the answer to question 12 is yes, it was known to

13    the government, that the fund was not in the process of

14    liquidating at the time that the -- I'm sorry.  That it was not

15    in the process of liquidating at the time the complaint was

16    filed, but we learned that, again, following the argument in

17    the motion to suppress.

18          And so, I think what we should have done here or I

19    think what we wish we had done was included a footnote in the

20    affidavit saying to the extent the complaint says liquidating,

21    it's actually just bankruptcy, and we didn't do that, and that

22    was an oversight on the government's part.  But for the reasons

23    I think we articulated in our briefing, to the extent there's a

24    difference between bankruptcy and liquidation, that's -- to the

25    extent there's a distinction between those terms, I think it's

1    a distinction without a difference in this context where, in

2    either event, the series of events set forth in the complaint

3    is accurate and the impression created is accurate.

4          THE COURT:  Let me ask, with regard to the wind down

5    in June that was announced in June of 2019, I take it that

6    that -- well, let me ask, is that the wind down?  In other

7    words, if I look at the transaction documents for the fund and

8    other things, is "wind down" a part of that or was this

9    something that isn't necessarily contemplated in the documents,

10    the underlying documents of the fund?  It was just -- I guess

11    my question goes to, wouldn't the wind down have led to the

12    liquidation of the fund?

13          MS. COLSON:  Your Honor, I think that question is too

14    complicated for me to answer now.

15          THE COURT:  Okay.  And it may be and I don't know

16    whether in connection with the wind down there was a document

17    saying this was going to be the process for the wind down or

18    something like that, or whether it is really just a term of art

19    for a fund like the fund that was present here.  So if you

20    want, Ms. Colson, you can respond in writing to that.

21          So question 13, I think I understand the response to

22    that question.

23          Ms. Colson, is there anything you wish to add to that

24    response?

25          MS. COLSON:  No, your Honor.

1          THE COURT:  Ms. Fletcher.

2          MS. FLETCHER:  Your Honor, we would agree that the

3     answer to question 13 is no.

4          THE COURT:  And I think I understand question 14,

5     which is a similar response, and it references back --

6     actually, this was almost a repetition of an earlier question,

7     which was question 6.

8          But anything else with regard to that question,

9     Ms. Colson?

10          MS. COLSON:  No, your Honor.

11          THE COURT:  Ms. Fletcher.

12          MS. FLETCHER:  No, we agree the answer is no.

13          THE COURT:  In connection with question 15, let me

14     ask, does the government know or have a sense of whether it was

15     factually accurate that investors did receive performance

16     reports that were emailed from the Google address?  Do you have

17     a sense, Ms. Fletcher, the frequency with which that happened

18     at all?

19          MS. FLETCHER:  If what your Honor means is for how

20     many investors that happened, no, but with respect to the

21     investor that I think is contemplated in the affidavit, it was

22     every month for a period of six months.

23          THE COURT:  So, Ms. Colson, in response to question

24     15, I understand that there was a process by which monthly

25     performance reports could be accessed by logging into -- well,

1    let me ask, Ms. Fletcher, do you know, in terms of the

2    performance reports, with regard to logging in, was that

3    something that people or investors could readily do, do you

4    know?

5        MS. FLETCHER:  I don't know, your Honor.  But what I

6    will say is that the -- so the answer to question 15 is yes,

7    it's factually accurate that the defendant provided investors

8    with monthly performance reports attached to emails.  Often,

9    what the defendant would do in those emails is say something

10   like this is also available on Intralinks.  I candidly don't

11   remember as I stand here whether any individual investors had

12   issues accessing Intralinks.

13       THE COURT:  And do you know whether the performance

14   reports that were mailed from the Google address, were they

15   consistent with the reports that were on Intralinks?

16       MS. FLETCHER:  That, I don't know.  I just haven't

17   done a comparison of the two types of reports.

18       MS. COLSON:  So if I understand what the government is

19   saying correctly, they have evidence that one investor received

20   six performance reports by Gmail and cannot establish that any

21   other investors received performance reports by Gmail.  My

22   understanding is that the default option for investors was to

23   access the reports through Intralinks, that they would receive

24   an email directly from Intralinks, not from Gmail, every month

25   reminding them to log in, and they had a login and password,

1    and it was quite simple to do so.

2            THE COURT:  Question 16, I think I understand the

3    issue there, but anything to add with regard to the response to

4    question 16?

5            MS. COLSON:  No, your Honor.

6            THE COURT:  Ms. Fletcher.

7            MS. FLETCHER:  No, only that we agree that the answer

8    is no.

9            THE COURT:  Mr. Shikiar, my recollection is that

10    Mr. Shikiar was introduced via email by -- and I don't remember

11    the gentleman's name, but was that other person a registered

12    investment advisor, I think?  Ms. Fletcher, do you know?

13            MS. FLETCHER:  Yes.  So the person who introduced

14    Mr. Shikiar by email is Greg Hersch.  That's wealth manager 1.

15    He's the individual who is the registered investment advisor

16    representing the trust that invested most of the funds under

17    management with FF Fund.  Mr. Greg Hersch was also the

18    registered investment advisor for a number of other individual

19    investors that invested with the fund.

20            THE COURT:  So Hersch was an RIA and he was an

21    investor.  Is that an accurate statement?

22            MS. FLETCHER:  So Greg Hersch is the founder of

23    Florence Capital, which is a registered investment advisor, and

24    his clients --

25            THE COURT:  Invested.

1          MS. FLETCHER:  -- invested with the fund at

2     Mr. Hersch's suggestion/direction.

3          THE COURT:  Anything else with regard to question 17,

4     Ms. Colson?

5          MS. COLSON:  No.

6          THE COURT:  18 is straightforward.

7          19 I think is straightforward.

8          Am I correct, in response to question 20, one of the

9     things that RIAs would do is suggest to clients to invest or

10    make the investment for the clients?  Are you suggesting that

11    the implication from what the postal inspector said was that

12    that was the only -- in other words, why wouldn't an RIA, yes,

13    they could do other things, but they're also a prospective

14    investor.

15         MS. COLSON:  Because the fund used RIAs for different

16    purposes.  Yes, there were RIAs who the fund looked to and had,

17    you know, to make investments on behalf of clients, but then

18    the fund used other RIAs for different purposes, and the RIAs

19    that it used for different purposes did not also make

20    investments on behalf of clients.  Just to say somebody is a

21    registered investment advisor, it doesn't necessarily indicate

22    or mean that that registered investment advisor has been hired

23    by the fund or retained by the fund to make investments on

24    behalf of clients.

25         THE COURT:  Ms. Fletcher, anything with regard to

1    question 20?

2           MS. FLETCHER:  Yes, your Honor.  I think that I would

3    just point your Honor to the portion of Greg Hersch's email

4    that we quote in our opposition brief because I think the

5    context there is important.  He says Stewart has built an

6    impressive business over the past three decades and is

7    interested in learning more about your fund.  So I think for

8    postal Inspector O'Rourke to read that email and characterize

9    Mr. Shikiar as a perfective investor in the fund is a totally

10   fair reading of that email.  And therefore, his statements

11   characterizing Mr. Shikiar, while it was a characterization,

12   are not untrue.

13          THE COURT:  I think I understand subsection A, that

14   there would have been a process, if there was going to be an

15   investment, whether it's know your client or know your customer

16   or something like that.  But am I correct, they wouldn't

17   necessarily have had to have met in person, there would have

18   been a form or some sort of paperwork that a prospective

19   investor would have to fill out before then and perhaps other

20   things before they could make an investment?

21          MS. COLSON:  Yes, there is a process, your Honor.  I

22   don't know that Mr. Franzone met every investor in person

23   because I don't know that every investor was located in

24   New York or Florida, but yes, there was an extensive process

25   that he had to go through before someone could invest in the

1   fund.

2          THE COURT:  Anything, Ms. Fletcher, with regard to

3   subsection A?

4          MS. FLETCHER:  Your Honor, we would just answer the

5   question no.

6          THE COURT:  Subsection B, I think that's

7   straightforward.

8          Anything else, Ms. Colson, on subsection B?

9          MS. COLSON:  No, your Honor.

10         THE COURT:  Ms. Fletcher.

11         MS. FLETCHER:  No, your Honor.

12         THE COURT:  Subsection C I think I understand.

13         Anything further on that, Ms. Colson?

14         MS. FLETCHER:  No, your Honor.

15         THE COURT:  Let me ask Ms. Fletcher, on subsection C,

16  with regard to either part, in the next section, Ms. Colson

17  indicates that the fund paid the $75,000, not Mr. Franzone.  Do

18  you have any insight on that?  She indicates that that was

19  incorporated because paragraph 8E of the complaint includes

20  comments about that.

21         MS. FLETCHER:  Your Honor, I would just say that I

22  think Franzone sending investor 2 the funds would be a true

23  statement, whether he directed those funds to be paid from a

24  fund bank account or from his personal bank account.  I don't

25  know as I stand here from which account in fact the funds were

N9QCfraO

1    sent, but it is accurate that investor 2 stated that she

2    received the funds directly from Andrew.  Whether investor 2

3    could perceive the difference between an Andrew Franzone

4    controlled bank account or a fund controlled account, that, I

5    don't know.

6          THE COURT:  I don't know the statement, "received the

7    funds directly from Andrew," was that something that was in --

8    let me just see.  I mean, 8E says on one occasion, in or about

9    2016, investor 2 requested $75,000 from investor 2's account at

10   the FF Fund, and Franzone promptly sent investor 2 the funds.

11         So Ms. Colson, you're saying that the implication

12   there is that, somehow, he's using his personal account?

13         MS. COLSON:  I believe that is the implication, your

14   Honor.  And I believe that because it came directly from

15   investor 2's affidavit in which she clearly stated that she

16   sought a redemption from the fund, but that the money was sent

17   to her by Mr. Franzone, and she made a clear distinction in her

18   affidavit.

19         THE COURT:  Let me ask, was there a process for

20   redemptions that could be accelerated?  It seems as if the

21   redemption request was made and then the monies were

22   forthcoming as opposed to other redemption requests.  As I

23   understand it, once they were made, they didn't have to be

24   satisfied until -- so they're made in one quarter and then

25   they're satisfied at some other period of time.  Is this some

1    other type of redemption?

2              MS. FLETCHER:  Your Honor, when investor 2 uses the

3    word "promptly," I don't know what she means by that and how

4    promptly the funds were returned to her.  So I can't answer

5    that question.

6              THE COURT:  Here's the implication, right, the squeaky

7    wheel gets the grease or whatever the saying is.  In other

8    words, there was a process for redemptions, that process would

9    take a certain period of time.  Investor 2 was like, I want my

10   money and in order to -- again, it could be read in order to

11   placate investor 2, the money, whether it was sent, and I grant

12   it, the funds were made available to, the redemption was put

13   through, and that's what I was trying to figure out, but I

14   understand that -- well, let me ask Ms. Fletcher, do you know

15   what the timing was in connection with that redemption that's

16   referenced in 8E?

17             MS. FLETCHER:  Off of the top of my head, no, except

18   that in 8E, it says on one occasion in or about 2016, which is

19   quite a few years before I would say the collapse of the fund.

20             I would also note, just because I think your Honor may

21   be reading this one way, which is that investor 2 was

22   complaining.  I think, actually, perhaps a more accurate

23   reading is informed by the fact that during this period of

24   time, 2016 --

25             THE COURT:  Things were liquid?

1    MS. FLETCHER:  No.  Maybe more liquid.  But what I was

2    actually going to say was that investor 2 and the defendant

3    were very close personally.  And so, I think rather than I

4    think as your Honor was maybe hypothesizing that investor 2 was

5    angry, I think it was more likely that she was given preference

6    over other investors.  Also, her redemption request at this

7    time was relatively small.  And relative to the, you know,

8    the -- relative to the redemption requests that were made in

9    2019.

10    MS. COLSON:  Your Honor, I just wanted to -- I think

11    we're reading a lot into this one statement.  So I really -- I

12    don't know the timing of the redemption and I don't think the

13    government knows either.

14    I would just note, since we're discussing prior

15    redemptions, that up until June 2019, the fund satisfied every

16    redemption request that was ever made, and that totaled in the

17    millions of dollars.

18    THE COURT:  Subsection D, anything to add, Ms. Colson,

19    with regard to that?

20    MS. COLSON:  No.

21    THE COURT:  Ms. Fletcher.

22    MS. FLETCHER:  No, your Honor.

23    THE COURT:  So I think I understand, obviously,

24    question 21 deals with cases, so I will take a look at those

25    cases, but as I understand, there's no case directly on point,

1    but that the Eleventh Circuit is informative, as well as in

2    connection with 21.  And *Shipp* is Judge Garaufis' case; is that

3    correct?

4              MS. COLSON:  That's correct.

5              THE COURT:  Ms. Fletcher, anything in regard to

6    question 21?

7              MS. FLETCHER:  No, your Honor.  I mean, I think what

8    your Honor asked is if Ms. Colson could point your Honor to a

9    case in which a judge had done, which she's asking the Court to

10   do here, and she was not able to identify a case.

11             THE COURT:  Question 22, I think I understand the

12   response there, and there are various cases cited.

13             Anything to add with regard to that, Ms. Colson?

14             MS. COLSON:  Your Honor, I just want to respond to

15   what the government said because it is, first of all, these

16   questions were posed to both of us, I don't think they were

17   just posed to me.  We were the only ones who chose to answer

18   them.

19             But I would say that while there is not a case

20   directly on point, and the argument that we have made is

21   somewhat unique in this case, I think it's actually quite

22   simple argument, which is that the allegations in the complaint

23   focused on Mr. Franzone's use of his Gmail account exclusively.

24   There were no allegations that concerned the use of any other

25   Google applications, and yet the warrant allowed the government

1    to search and seize his entire Google account.  So in that

2    sense, it was overbroad because it exceeded the factual

3    allegations in the complaint establishing probable cause.

4         We have found analogous cases, and most notably *United*

5    *States v. Shipp*, which deals with a warrant to search and seize

6    an entire Google account, which I believe is quite similar for

7    the reasons stated in my answer to a Google account.

8         THE COURT:  Facebook.

9         MS. COLSON:  Facebook, correct.

10        THE COURT:  Is there anything in the search warrant

11   affidavit — and this just occurred to me — that indicates that

12   these accounts, that either it was known or is it common that

13   these Google accounts would be linked in some sort of way?

14        MS. FLETCHER:  Your Honor, so yes, and this is

15   described on page 14 of our opposition brief.  So the search

16   warrant is directed to Google for the evidence contained within

17   a single account and that account contains different types of

18   data.  I think what Ms. Colson is arguing is that we articulate

19   in the search warrant affidavit only probable cause to believe

20   that the defendant used the Gmail component of Google and did

21   not use some of the other applications that would have data and

22   be contained within the broader Google account, but the search

23   warrant affidavit specifically laid out what a lot of those

24   other functions are and how they work, and it described

25   probable cause to believe that the defendant did a whole bunch

1    of things, the data for which would be included in those other

2    applications.  For example, we say or Inspector O'Rourke said

3    in his search warrant affidavit that individuals like the

4    defendant who engage in fraud schemes use electronic devices

5    and accounts to keep track of coconspirators and victims'

6    contact information.  So that's the type of data that would be

7    included in a Google account within Google contacts, not

8    necessarily within Gmail.

9          He also described how the communications could be

10   included in email and electronic messages and images.  So

11   images would not necessarily be contained within the Gmail

12   component of Google and would instead be contained potentially

13   in an application called Google Photos for chats, the data

14   could be contained within Google Hangouts.

15         So I certainly won't read the rest of this to your

16   Honor, but I think the point is that we articulated -- postal

17   Inspector O'Rourke articulated in the affidavit the types of

18   evidence that might exist and explained the different

19   applications that were contained within an individual Google

20   account.

21         And just with respect to No. 21, to the extent that it

22   was unclear, your Honor, I understood the question to be

23   directed to me also.  I'm also not aware of any case in which

24   the court has suppressed evidence seized from a defendant's

25   Google application based on the argument that the search

1    warrant affidavit only related to one Google application.

2        But also, I would point your Honor to the section of

3    the opposition that we just discussed, which is to say the

4    affidavit here doesn't only relate to one Google application,

5    it relates to a number of Google applications.

6        MS. COLSON:  Your Honor, I think that's incorrect.  I

7    think that the specific factual allegations in the affidavit

8    relate to one Google application.  Agent O'Rourke did state

9    that in his expert opinion, criminals typically use Google for

10   X, Y, and Z reasons, but he didn't actually provide any

11   evidence of Mr. Franzone's behavior as such.

12        So, for example, there is no evidence that

13   Mr. Franzone used Google to keep track of contact information,

14   that Mr. Franzone used Google Hangouts, that Mr. Franzone used

15   Google Docs.  And so, without those specific factual

16   allegations, the opinion of an expert that criminals typically

17   do X, Y, or Z is insufficient, and we have cited case law in

18   our reply brief to support that.

19        THE COURT:  Why wouldn't this be -- wouldn't many of

20   these things that say, and this is a separate issue, but

21   wouldn't many of these things be on a phone?  So a search

22   warrant for a phone may have an affidavit for the phone, some

23   of it may be generic sort of, the experience-type thing, but

24   some of it may be specific information with regard to emails

25   that the person is or the government knows or the postal

| | |
|---|---|
| 1 | inspector or whoever the affiant is indicates they have emails |
| 2 | that indicate this, but the application is for the phone and |
| 3 | evidence of crimes on the phone, which could include Gmail, it |
| 4 | could include photos, it could include all sorts of things. |
| 5 | Why is it analogous to that sort of an application? |
| 6 | MS. COLSON: It is somewhat analogous, but of course a |
| 7 | phone is one singular device. So once you have it in hand, and |
| 8 | typically, when the government seeks a search warrant to search |
| 9 | an individual's phone, they've already seized that phone upon |
| 10 | arrest or upon searching an individual's apartment or home. In |
| 11 | this case, it's very different because the government was able |
| 12 | to make a choice before going to Google and it could have |
| 13 | easily limited its search warrant application to avoid these |
| 14 | sorts of constitutional concerns. |
| 15 | THE COURT: Question 22, so I think I understand. |
| 16 | Is there anything, Ms. Colson, you wish to add in |
| 17 | connection to question 22? |
| 18 | MS. COLSON: No, your Honor. |
| 19 | THE COURT: Ms. Fletcher. |
| 20 | MS. FLETCHER: Nothing to add, your Honor. |
| 21 | THE COURT: Question 23, so I think I understand that |
| 22 | the argument is basically there's no probable cause and |
| 23 | therefore the agent, the postal inspector couldn't rely on it |
| 24 | because it was so devoid of probable cause. |
| 25 | MS. COLSON: The argument is that there was no |

1　probable cause with respect to the non-email applications in

2　Google.

3　　　　THE COURT:  Ms. Fletcher, anything with regard to

4　question 23?

5　　　　MS. FLETCHER:  No, your Honor.  I mean, I think the

6　arguments that I made with respect to question 21 apply equally

7　here.

8　　　　THE COURT:  Ms. Colson, I note there have been various

9　points where you've indicated that there may be some additional

10　things you want to submit in writing, but is there anything you

11　would wish to add at this time with regard to the papers

12　related to the Google search warrant?

13　　　　MS. COLSON:  No, your Honor.

14　　　　THE COURT:  Ms. Fletcher, anything that you wish to

15　add with regard to the government's papers with regard to the

16　Google search warrant?

17　　　　MS. FLETCHER:  Your Honor, just briefly, because I

18　know that your Honor had a lot of factual questions, and I know

19　your Honor is familiar with the standard, but I would just

20　remind your Honor that the idea here, what your Honor's being

21　asked to consider is not whether there were technical

22　inaccuracies in the affidavit, but whether there is a -- the

23　errors were of a type and of a character and were put into the

24　affidavit demonstrating that the inspector intended to mislead

25　the magistrate.  And I think in light of what the errors --

1   what the alleged errors were, which are either very technical

2   errors or not in fact errors at all, the defendant has not made

3   the substantial showing that Inspector O'Rourke acted with the

4   intent or with the reckless disregard that he was deceiving the

5   magistrate.  So the defendant's motion should be denied and

6   there is not even a substantial showing made that would justify

7   a *Franks* hearing here.

8           MS. COLSON:  I do want to respond.

9           THE COURT:  Sure.

10          MS. COLSON:  In order to get a *Franks* hearing, you

11   would have to make a substantial preliminary showing of

12   material misstatements and recklessness, and I believe we have

13   met that burden.  We identified for the Court five

14   misstatements made by O'Rourke.  We also identified material

15   information linked to those misstatements that O'Rourke

16   neglected to include, and that could probably be characterized

17   as omissions.  I'm referring in particular here to all of the

18   information about the reorganization process.  We have shown

19   that those statements were material.  They materially affected

20   the magistrate judge's understanding of the nature and timing

21   of the bankruptcy process, which, in turn, affected her view of

22   the principal allegations of fraud in the complaint and in

23   O'Rourke's affidavit, including particularly that the fund was

24   insolvent, that the fund was unable to meet redemptions, and

25   that the fund's investments were worthless or significantly

1    impaired.

2           I believe we have also met the standard for

3    recklessness.  In fact, we demonstrated that by the time

4    O'Rourke wrote the affidavit in December of 2022, he already

5    knew that there were certain facts in the complaint that were

6    incorrect and he failed to correct them, and that includes the

7    timing of the bankruptcy, the nature of the bankruptcy

8    proceedings.  I believe we've also demonstrated in our papers

9    that he knew or should have known that the CRO was court

10   approved rather than court appointed.

11          So I believe we have met the standard both for

12   materiality and recklessness, and certainly we have made a

13   substantial preliminary showing of that.

14          THE COURT:  Thank you.

15          So, Ms. Colson, in terms of any additional submissions

16   you'd like to make, how much time would you like to do that?

17          MS. COLSON:  It's going to take some research, your

18   Honor, so I would ask for four weeks.

19          THE COURT:  And Ms. Fletcher, to the extent you want

20   to respond, I'll let you do that.  As soon as Ms. Colson files

21   her letter or papers with regard to that, let me know how much

22   time you would need to respond or if you're not going to

23   respond, that's fine.

24          MS. FLETCHER:  Will do, your Honor.

25          THE COURT:  Is there anything else that we should deal

1    with today?  From the government.

2                MS. FLETCHER:  No, your Honor.  Thank you.

3                THE COURT:  From the defense.

4                MS. COLSON:  No, your Honor.

5                THE COURT:  Thank you very much.  And I apologize,

6    unfortunately, for my late questions.  I just find it, and

7    perhaps I need to focus earlier, but I find it useful if I put

8    my questions down so that the parties are prepared to answer

9    the questions rather than having an oral argument where I ask

10   questions and the parties need to come back to me.

11               Thank you very much.  We'll stand adjourned.

12                               * * *

13

14

15

16

17

18

19

20

21

22

23

24

25